Filed 3/26/21  P. v. McWilliams CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DUVANH ANTHONY MCWILLIAMS,<br><br>    Defendant and Appellant. | H045525<br>(Santa Clara County<br> Super. Ct. No. C1754407)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The court orders that the opinion and the concurring and dissenting opinion filed March 8, 2021, be modified as follows:

On page 2, first full paragraph, at the end of the last sentence, add a footnote that states:

After we issued our decision in this matter, defendant filed a request to augment the record with a certified rap sheet that "establishes that his 'Race' is 'Black.' "  In response to the request, the Attorney General stated, "It is undisputed that [defendant] is Black.  Since [defendant] was present at the suppression hearing, [the Attorney General] does not object to judicial notice of a record outside the suppression hearing for the sole purpose of establishing [defendant's] race.  (Evid. Code, § 452, subd. (h).)"  Accordingly, we grant defendant's request to augment the record by separate order.

On page 9, move footnote 6 from the end of the first sentence of the second full paragraph to the end of the first sentence of the third full paragraph. Add the following sentence to the end of the footnote:

Further, as the Attorney General observes, "there [was] no evidence of racial profiling and, indeed, all evidence admitted at the suppression hearing omits any mention of race." (But see fn. 2, *ante*, p. 2 [defendant personally appeared at the suppression hearing].)

All footnotes commencing with footnote 2 shall be renumbered accordingly.

On page 7, of the concurring and dissenting opinion, delete footnote 1, which states, "The race of McWilliams himself is not established by the record on appeal, although presumably it was known to those involved in the proceedings in the trial court. The issue with respect to application of the attenuation doctrine under these circumstances is the uncontrolled exercise of discretion by the police and concomitant concerns about the influence of bias, whether explicit or unconscious."

The petition for rehearing filed on behalf of defendant Duvanh Anthony McWilliams is denied.

There is no change in the judgment.

_____
BAMATTRE-MANOUKIAN, J.

_____
ELIA, ACTING P.J.

_____
DANNER, J.

Filed 3/8/21  P. v. McWilliams CA6 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H045525 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1754407) |
| v. | |
| DUVANH ANTHONY MCWILLIAMS, | |
| Defendant and Appellant. | |

## I.     INTRODUCTION

Defendant Duvanh Anthony McWilliams pleaded guilty to possession of methamphetamine for sale (Health & Saf. Code, § 11378), unlawful possession of a firearm (Pen. Code, § 29800, subd. (a)(1)),[1] and unlawful possession of ammunition (§ 30305, subd. (a)(1)) and admitted several sentencing allegations (§§ 12022, subd. (c), 667.5, subd. (b), 667, subds. (b)-(i), 1170.12).  Pursuant to the terms of a negotiated disposition, the trial court sentenced defendant to seven years in state prison.

Defendant's sole contention on appeal is that the trial court erred when it denied his motion to suppress evidence.  Defendant claims that he was illegally detained because there was no reasonable suspicion he was involved in criminal activity.  Defendant further asserts that the officer's subsequent discovery that he was on active parole does not trigger the application of the attenuation doctrine because the evidence against him

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

was obtained by exploiting the unlawful detention. The Attorney General counters that defendant's detention was supported by reasonable suspicion and that even assuming the detention was unlawful, defendant's parolee status supplied independent legal authorization for the ensuing search under the attenuation doctrine.

We determine that the officer lacked reasonable suspicion to detain defendant based on the absence of "specific articulable facts that, considered in light of the totality of the circumstances, provide[d] some objective manifestation that [defendant] may [have] be[en] involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231 (*Souza*).) However, under the principles articulated in *Utah v. Strieff* (2016) 136 S.Ct. 2056 (*Strieff*) and *People v. Brendlin* (2008) 45 Cal.4th 262 (*Brendlin*), we conclude that the officer's discovery of defendant's "active and searchable CDC[R] parole" status constituted an intervening circumstance that sufficiently attenuated the connection between the detention and the evidence seized during the ensuing search, rendering suppression unwarranted. Accordingly, we affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Charges*

Defendant was charged by information with possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 1), transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a); count 2), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3), and unlawful possession of ammunition (§ 30305, subd. (a)(1); count 4). It was also alleged that defendant was personally armed with a firearm during the commission of counts 1 and 2 (§ 12022, subd. (c)), had served a prior prison term (§ 667.5, subd. (b)), and had a prior juvenile adjudication that qualified as a strike (§§ 667, subds. (b)-(i), 1170.12; Welf. & Inst. Code, § 707, subd. (b)).[2]

---

[2] The prosecution subsequently filed an amended information that substituted phencyclidine (PCP) for methamphetamine in counts 1 and 2 (Health & Saf. Code,
(continued)

2

**B.** *Motion to Suppress Evidence*

Defendant filed a motion to suppress evidence (§ 1538.5), asserting that the prosecution had the burden to justify the warrantless detention and search (see *People v. Williams* (1999) 20 Cal.4th 119, 130).

The prosecution filed written opposition, conceding that defendant had been detained without a warrant when an officer asked him to exit his parked vehicle, but contending that the detention was lawful because it was based on a reasonable suspicion that defendant was involved in criminal activity. The prosecution argued that there was reasonable suspicion to detain defendant based on a 911 call reporting suspicious activity in the area and the fact that it was nighttime, defendant's vehicle was parked in "a private business parking lot" after business hours "on an observed holiday," defendant was "in a position of partial concealment" inside the vehicle, and defendant "was not dressed like he was going to work." The prosecution asserted that the subsequent search was lawful because a records check revealed that defendant was on parole.[3]

Defendant did not file a reply.

**C.** *Evidence Elicited at the Motion to Suppress Hearing*

At approximately 6:52 p.m. on January 2, 2017, San Jose Police Officer Matthew Croucher was dispatched to a Broadcom parking lot. A Broadcom security guard had called 911 to report "a possible vehicle burglary."

When Officer Croucher arrived, the security guard informed him that there were two "suspicious individuals on bikes in the [Broadcom] parking lot." The guard stated

---

§§ 11378.5, 11379.5, subd. (a)). Pursuant to the terms of the negotiated disposition, the trial court later granted the prosecution's request to withdraw the amended information and restore the original information as the charging document.

[3] Although the prosecution included in its written opposition that attenuation was one situation where the exclusionary rule would not mandate suppression, it made no argument that the attenuation doctrine applied here—either in its opposition or at the suppression hearing.

that the individuals were using flashlights to look into cars. Officer Croucher drove through the lot, finding nothing of note.

As part of his investigation into the guard's report, Officer Croucher drove through an adjacent parking lot that the security guard directed him to. Approximately four or five vehicles were parked in the lot. Initially, nothing in the lot attracted Officer Croucher's attention, but when he used his spotlight, Officer Croucher saw that the front passenger seat of one of the parked cars was occupied. Officer Croucher observed that the seat was fully reclined and saw "the top of what appeared to be a human head." Officer Croucher realized that the occupant was "just somebody hanging out in the car," not sleeping. The car was the only occupied vehicle in the lot. Officer Croucher decided to detain the occupant, later identified as defendant.

Officer Croucher pulled his patrol vehicle approximately two car lengths behind defendant's car. Another officer arrived and pulled to the side of Officer Croucher's vehicle.

Officer Croucher made "verbal contact [with defendant] from the front of [his] vehicle," while the other officer on scene stood a couple of feet behind Officer Croucher. Officer Croucher identified himself as a police officer and instructed defendant to get out of the vehicle for officer safety reasons, as he does "with most car stops . . . or most suspicious vehicles that [he] come[s] across." Defendant's vehicle was suspicious to Officer Croucher because it was in a dark lot of what he believed to be a closed business. The officer had been to the lot many times and passed through it during the day when the businesses were open and there were significantly more vehicles. The interiors of the buildings were dark and no one was walking around the lot. The officer felt he "had reasonable suspicion, based on what the security guard told [him], that [defendant] may or may not have been related to the subjects that we were looking for."

Defendant exited his vehicle and moved toward the patrol car at Officer Croucher's request. When Officer Croucher asked defendant for identification, he stated

4

that it was in the car. Officer Croucher directed defendant to retrieve his identification, which he did. Upon running a records check, Officer Croucher learned that defendant was "on active and searchable CDC[R] parole."[4]

### D. *Arguments and Ruling*

Defendant argued that Officer Croucher did not have reasonable suspicion to detain him, observing that Officer Croucher detained him because "it was dark, he believed the business was closed, and there was a small number of cars." Defendant also asserted that "the call that attracted the police to the parking lot was a call . . . that didn't match what was going on with [him] at all."

The prosecution conceded that defendant was detained when he was ordered from his vehicle. The prosecution argued there was reasonable suspicion to detain defendant based on "the fact that [defendant] was in partial concealment, the time of night, the fact the business was closed, there's poor visibility, . . . there were no other individuals [in the parking lot] and [the officers were] responding to a 9-1-1 call based on suspicious activity." The prosecution disputed that none of the circumstances matched the 911 call because the officer "responded in a short amount of time and . . . the only person in that adjacent parking lot was the defendant's vehicle." The prosecution asserted that one of the two individuals the security guard saw looking into cars "could easily have jumped inside a car; the fact that [defendant's] seat was reclined all the way back, he could only see the top of his head, this was suspicious to the officer."

The trial court denied the motion to suppress, determining that "the information from the security guard plus the presence of the defendant in the parking lot of the closed business with no one else seemingly around does give the officer . . . reasonable

---

[4] The parties did not question the officer at the suppression hearing regarding what occurred after he learned defendant was on parole. Evidence elicited at the preliminary hearing established that after discovering defendant's parolee status, officers searched defendant's vehicle, finding narcotics, a scale, plastic baggies, an unloaded handgun, and ammunition.

5

suspicion to detain and further investigate."

### E. *Pleas and Sentencing*

Defendant pleaded guilty to possession of methamphetamine for sale, unlawful possession of a firearm, and unlawful possession of ammunition and admitted the arming, prior prison term, and prior strike allegations.

Pursuant to the terms of a negotiated disposition, the trial court sentenced defendant to seven years in state prison.

## III. DISCUSSION

Defendant contends the trial court erred when it denied his motion to suppress evidence. Defendant argues that he was detained without reasonable suspicion when the police ordered him out of his car and that the evidence against him was obtained by exploiting the illegal seizure. Relying primarily on this court's decision in *People v. Bates* (2013) 222 Cal.App.4th 60 (*Bates*), defendant asserts that the officer's discovery of his parolee status did not constitute an intervening circumstance that attenuated the taint of the unlawful detention. The Attorney General counters that the trial court properly denied the suppression motion because defendant's detention was supported by reasonable suspicion. Alternatively, the Attorney General argues that the "search was . . . attenuated" from the detention because it did not occur until after the officer learned defendant was on parole, the officer's authority to conduct a parole search was independent of the circumstances that led to defendant's detention, and "[t]here is no indication . . . the officer intended to perform a search at the time he approached [defendant's] vehicle."

Based on the totality of the circumstances, we determine that Officer Croucher lacked reasonable suspicion to detain defendant when he ordered him from his car because there were not specific articulable facts that objectively demonstrated that defendant may have been involved in criminal activity. (See *Souza*, *supra*, 9 Cal.4th at p. 231.) However, we conclude, under the principles articulated in *Strieff* and *Brendlin*,

6

that on the facts of this case, defendant's parolee status, which the officer discovered before he performed the search, sufficiently attenuated any taint from the unlawful detention, rendering suppression of the evidence unwarranted.[5]

## A.    *Standard of Review*

"Defendant, as the moving party, had the initial burden of proving a warrantless search or seizure occurred. [Citation.] There was no warrant in this case, so the burden shifted to the prosecution to show any warrantless searches or seizures were justified under the Fourth Amendment to the United States Constitution. [Citation.] '[T]he controlling burden of proof at suppression hearings . . . [is] proof by a preponderance of the evidence.' [Citation.]" (*People v. Flores* (2019) 38 Cal.App.5th 617, 626 (*Flores*).)

In ruling on a motion to suppress, the trial court "must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. [Citation.] We review the court's resolution of the factual inquiry under the deferential substantial evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review. [Citation.]" (*People v. Ramos* (2004) 34 Cal.4th 494, 505.)

"[S]ince voter approval of Proposition 8 in June 1982, state and federal claims relating to exclusion of evidence on grounds of unreasonable search and seizure are measured by the same standard. [Citations.] 'Our state Constitution thus forbids the

---

[5] Although the prosecution argued in its written opposition that defendant's parolee status authorized the search and introduced evidence at the suppression hearing that defendant was on parole, the prosecution did not argue that the attenuation doctrine applied, and the trial court denied the suppression motion based on its finding that there was reasonable suspicion to detain. Defendant does not assert on appeal that the prosecution forfeited an attenuation claim or that he was prejudiced by the prosecution's failure to argue attenuation below. (Cf. *Brendlin*, *supra*, 45 Cal.4th at p. 267, fn. 1.) Nor was forfeiture mentioned at oral argument. Rather, defendant raised the attenuation doctrine in his opening brief, arguing that it does not apply here.

courts to order the exclusion of evidence at trial as a remedy for an unreasonable search and seizure unless that remedy is required by the federal Constitution as interpreted by the United States Supreme Court.' [Citation.]" (*People v. Camacho* (2000) 23 Cal.4th 824, 830, fn. omitted.)

**B.** ***The Officer Lacked Reasonable Suspicion to Detain Defendant***

"The Fourth Amendment to the United States Constitution prohibits seizures of persons, including brief investigative stops, when they are 'unreasonable.' (*Terry v. Ohio* (1968) 392 U.S. 1, 19 & fn. 16; [citation].)" (*Souza*, *supra*, 9 Cal.4th at p. 229.) When a police contact rises to the level of an investigative stop or detention, the detention is reasonable under the Fourth Amendment if the officer has "reasonable suspicion to believe the individual is involved in criminal activity" or "advance knowledge that the individual is on searchable probation or parole." (*People v. Douglas* (2015) 240 Cal.App.4th 855, 860.)

Reasonable suspicion exists "when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*Souza*, *supra*, 9 Cal.4th at p. 231.) In other words, a detention is valid if "the circumstances known or apparent to the officer . . . include specific and articulable facts . . . that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he [or she] intends to stop or detain is involved in that activity." (*In re Tony C.* (1978) 21 Cal.3d 888, 893 (*Tony C.*), superseded by statute on another ground as stated in *People v. Lloyd* (1992) 4 Cal.App.4th 724, 733 (*Lloyd*).) "The officer's . . . suspicion must be objectively reasonable, and 'an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]' [Citation.]" (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.)

8

Here, as the prosecution conceded below, defendant was detained when Officer Croucher ordered him to exit his vehicle. (See *Florida v. Bostick* (1991) 501 U.S. 429, 436-437.) Officer Croucher testified that he "had reasonable suspicion, based on what the security guard told [him], that [defendant] may or may not have been related to the subjects that we were looking for."

A security guard reported to Officer Croucher that were two "suspicious individuals on bikes in the [Broadcom] parking lot" who were using flashlights to look into cars.[6] Using his spotlight, Officer Croucher located defendant reclined in the passenger seat of a vehicle that was parked in an adjacent lot that the security guard directed him to. Defendant's vehicle was the only occupied car in the lot, which contained four or five parked vehicles. Defendant was "just somebody hanging out in the car," not sleeping.

Although it was appropriate for Officer Croucher to investigate the security guard's report of suspicious activity, nothing about defendant matched the guard's description of the individuals involved. Defendant was alone in a car, rather than on a bicycle accompanied by another individual on a bike. There was no testimony that Officer Croucher saw anyone else in the lot or any bicycles or flashlights in or near defendant's parked car. Defendant's vehicle did not have a bike rack. Defendant was parked in a lot adjacent to the parking lot where the suspicious activity occurred, but "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." (*Illinois v. Wardlow* (2000) 528 U.S. 119, 124.)

---

[6] There was no testimony that the security guard provided Officer Croucher with a description of the individuals' physical characteristics or race. Approximately 23 seconds of video footage from an officer's body camera was admitted into evidence, but defendant does not appear in the footage.

Nor was defendant's conduct in the neighboring lot suggestive of criminal activity. At approximately 7:00 p.m. in January, it was dark out and the business associated with the lot was apparently closed. But there was no evidence that the lot was private. And while defendant was reclined in the passenger seat of his vehicle, Officer Croucher did not testify that defendant made any furtive movements when he saw the officer's patrol car. Defendant's mere presence in a vehicle located in a closed business's parking lot does not constitute "specific and articulable facts . . . that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) [defendant] is involved in that activity." (*Tony C.*, *supra*, 21 Cal.3d at p. 893; see *People v. Roth* (1990) 219 Cal.App.3d 211, 215 [holding there was no reasonable suspicion to detain based on the defendant's "early morning presence in the deserted parking lot of a shopping center whose businesses were closed" as "[t]he circumstances were devoid of indicia of his involvement in criminal activity"].)

The Attorney General argues that "officers responding to the report of a crime may detain a person who is in the vicinity despite the lack of a description of the suspect, particularly if no one else is in the area." Here, however, there was a description of the suspects—two individuals on bicycles with flashlights looking into cars—that defendant did not match. Moreover, the cases relied on by the Attorney General are distinguishable in that they each involved a reported crime, rather than suspicious activity, and someone traveling away from the scene shortly after the crime occurred with no one else in the area. (See *People v. Brown* (2015) 61 Cal.4th 968, 984; *People v. Conway* (1994) 25 Cal.App.4th 385, 390; *Lloyd*, *supra*, 4 Cal.App.4th at pp. 733-734; *People v. Anthony* (1970) 7 Cal.App.3d 751, 761.) Defendant, in contrast, was simply reclining in his parked car when the officer noticed him.

The Supreme Court remarked in its application of the attenuation doctrine in *Strieff* that "[n]othing prevented [the officer] from approaching [the defendant] simply to ask" what was going on. (*Strieff*, *supra*, 136 S.Ct. at p. 2063.) We likewise observe

10

that officer safety permitting, Officer Croucher could have engaged in a consensual encounter with defendant to better assess whether defendant was connected to the "possible vehicle burglary" and individuals on bicycles with flashlights looking into cars. Without "specific and articulable facts" that defendant may have been involved in criminal activity, however, Officer Croucher was without legal cause to order defendant out of his car, thereby detaining him.  (See *Tony C.*, *supra*, 21 Cal.3d at p. 893.)

C.  ***The Officer's Discovery of Defendant's Parolee Status Sufficiently Attenuated the Connection Between the Unlawful Detention and the Evidence Seized***

Where a detention is unreasonable, the exclusionary rule may mandate suppression of the evidence obtained as a direct result of the unlawful detention and any " 'evidence later discovered and found to be derivative of an illegality.' " (*Strieff*, *supra*, 136 S.Ct. at p. 2061.)  However, "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." (*Hudson v. Michigan* (2006) 547 U.S. 586, 592 (*Hudson*).)  "[B]ut-for causality is only a necessary, not a sufficient, condition for suppression." (*Ibid.*)

Under the attenuation doctrine, evidence may be admissible despite that it would not have been discovered " ' "but for" ' " illegal police conduct.  (*Brendlin*, *supra*, 45 Cal.4th at p. 268.)  "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote *or* has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' [Citation.]" (*Strieff*, *supra*, at p. 2061, italics added; see also *Brown v. Illinois* (1975) 422 U.S. 590, 603.)  The question in an attenuation case " ' "is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " ' " (*Brendlin*, *supra*, at p. 268.)

11

"[T]he general framework for analyzing a claim of attenuation under the Fourth Amendment is well settled. [Citation.] '[T]he question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality.' [Citation.] 'Relevant factors in this "attenuation" analysis include the temporal proximity of the Fourth Amendment violation to the procurement of the challenged evidence, the presence of intervening circumstances, and the flagrancy of the official misconduct.' [Citations.]" (*Brendlin*, *supra*, 45 Cal.4th at pp. 268-269.) The third factor, flagrancy, is " 'particularly' significant" (*Strieff*, *supra*, 136 S.Ct. at p. 2062) and "generally regarded as the most important" (*Brendlin*, *supra*, at p. 271).

Accordingly, to determine whether the connection between defendant's unlawful detention and the evidence seized was sufficiently attenuated by the discovery of defendant's parolee status to render suppression of the evidence unwarranted, we analyze each attenuation factor in turn.

### 1. Temporal Proximity of the Detention to the Evidence's Discovery

We first examine "the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed" the illegal police conduct. (*Strieff*, *supra*, 136 S.Ct. at p. 2062.) This factor generally disfavors attenuation "unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." (*Ibid.*)

At the suppression hearing, the parties did not question Officer Croucher regarding what transpired after he learned defendant was on parole. Consequently, no evidence was presented regarding the time that elapsed between defendant's initial detention and the search. We must therefore conclude this factor weighs against attenuation as it is the prosecution's burden to establish the legality of the search (see *Flores*, *supra*, 38

12

Cal.App.5th at p. 626), and there was no evidence that " 'substantial time' " elapsed between the detention and search (*Strieff*, *supra*, 136 S.Ct. at p. 2062).

### 2. Presence of Intervening Circumstances

We next assess whether defendant's parolee status constituted an " 'intervening circumstance.' " (*Brendlin*, *supra*, 45 Cal.4th at p. 269.)

In *Strieff*, a case involving an officer's discovery of an outstanding arrest warrant for the defendant after the officer had unlawfully detained him, the Supreme Court determined this factor "strongly favor[ed] the State." (*Strieff*, *supra*, 136 S.Ct. at p. 2062.) The Court observed that "the warrant was valid, it predated [the officer's] investigation, and it was entirely unconnected with the stop." (*Ibid.*)

Similarly, in *Brendlin*, which also involved the discovery of an outstanding arrest warrant during an otherwise unlawful detention, our high court noted that the warrant "supplied legal authorization to arrest [the] defendant that was completely independent of the circumstances that led the officer to initiate the traffic stop" and that the search was performed only after the warrant's existence was confirmed. (*Brendlin*, *supra*, 45 Cal.4th at p. 271.) The court further observed that "[a] warrant is not reasonably subject to interpretation or abuse." (*Ibid.*) Thus, the court concluded that "[t]he challenged evidence was . . . the fruit of the outstanding warrant, and was not obtained through exploitation of the unlawful traffic stop." (*Ibid.*)

While we recognize that defendant's parolee status is different from the arrest-warrant intervening circumstance present in both *Strieff* and *Brendlin* because an arrest warrant places a duty on law enforcement to make an arrest, here, too, defendant's status as a parolee "predated Officer [Croucher's] investigation" and "was entirely unconnected with the stop." (*Strieff*, *supra*, 136 S.Ct. at p. 2062.) Defendant's parolee status "supplied legal authorization to [search] defendant that was completely independent of the circumstances that led the officer to initiate the [detention]." (*Brendlin*, *supra*, 45 Cal.4th at p. 271.)

13

In addition, as with an outstanding arrest warrant, parolee status "is not reasonably subject to interpretation," although it may be subject to "abuse." (*Brendlin*, *supra*, 45 Cal.4th at p. 271; cf. *People v. Reyes* (1998) 19 Cal.4th 743, 752 [a parole search may violate the Fourth Amendment if it is "arbitrary, capricious or harassing"]; § 3067, subd. (d) ["It is not the intent of the Legislature to authorize law enforcement officers to conduct [parole] searches for the sole purpose of harassment"].) "Under California statutory law, every inmate eligible for release on parole 'is subject to search or seizure by a . . . parole officer or other peace officer at any time of the day or night, with or without a search warrant or with or without cause.' (Pen.Code, § 3067, subd. (b)(3).)" (*People v. Schmitz* (2012) 55 Cal.4th 909, 916.) Inmates are notified of the search condition before their release. (Cal. Code Regs., tit. 15, §§ 2510, 2511.) And, as in *Strieff* and *Brendlin*, the officer did not perform the search until after he became aware of his authority to do so. (See *Strieff*, *supra*, 136 S.Ct. at p. 2063; *Brendlin*, *supra*, at p. 271.)

Thus, under the principles articulated in *Strieff* and *Brendlin* and based on the facts before us, we conclude that because the search occurred only after the officer learned defendant was on parole, defendant's parolee status constituted an intervening circumstance as his parolee status predated the detention, was not subject to interpretation, and supplied entirely independent legal authorization for the search. (See *Strieff*, *supra¸*136 S.Ct. at p. 2062; *Brendlin*, *supra*, 45 Cal.4th at p. 271.)

### 3.  Flagrancy and Purposefulness of Official Misconduct

The third factor, the flagrancy and purposefulness of official misconduct, "is generally regarded as the most important because 'it is directly tied to the purpose of the exclusionary rule—deterring police misconduct.' " (*Brendlin*, *supra*, 45 Cal.4th at p. 271.)

In *Strieff*, the Supreme Court found no flagrancy where an officer unlawfully stopped the defendant after surveilling a house that was the subject of an anonymous tip

14

regarding " 'narcotics activity.' "[7] (*Strieff*, *supra*, 136 S.Ct. at p. 2059.)  Over the course of a week, the officer observed that the residence frequently hosted visitors who left a few minutes after their arrival.  (*Ibid.*)  The officer detained the defendant after he exited the house and walked to a nearby convenience store.  (*Id.* at p. 2060.)  After obtaining the defendant's identification and relaying the information to dispatch, the officer learned the defendant had an outstanding warrant for his arrest.  (*Ibid.*)  The officer arrested the defendant and searched him, finding drugs and related paraphernalia.  (*Ibid.*)

The Court determined that the officer "was at most negligent" in detaining the defendant because he "made two good-faith mistakes."  (*Strieff*, *supra*, 136 S.Ct. at p. 2063.)  First, the officer "lacked a sufficient basis to conclude that [the defendant] was a short-term visitor who may have been consummating a drug transaction" because he failed to observe when the defendant arrived at the house.  (*Ibid.*)  Second, because the officer lacked information regarding the length of the defendant's visit, the officer should have engaged in a consensual encounter with the defendant, instead of demanding the defendant speak to him.  (*Ibid.*)

The Court concluded that "these errors in judgment hardly r[o]se to a purposeful or flagrant violation of [the defendant's] Fourth Amendment rights."  (*Strieff*, *supra*, 136 S.Ct. at p. 2063.)  "While [the officer's] decision to initiate the stop was mistaken, his conduct thereafter was lawful.  The officer's decision to run the warrant check was a 'negligibly burdensome precautio[n]' for officer safety.  [Citation.]  And [the officer's] actual search of [the defendant] was a lawful search incident to arrest.  [Citation.]  [¶] Moreover, there [was] no indication that this unlawful stop was part of any systemic or recurrent police misconduct.  To the contrary, all the evidence suggest[ed] that the stop was an isolated instance of negligence that occurred in connection with a bona fide

---

[7] The prosecution conceded at the suppression hearing that the stop was unlawful. (*Strieff*, *supra*, 136 S.Ct. at p. 2060.)

15

investigation of a suspected drug house," based on the anonymous tip and the officer's personal observations. (*Ibid.*)

In *Brendlin*, an officer saw a vehicle with expired registration tags and learned "through dispatch that the car's registration had expired two months earlier but that a renewal application was 'in process.'" (*Brendlin*, *supra*, 45 Cal.4th at p. 265.) The officer stopped the vehicle "in order to investigate the vehicle's registration" despite "the temporary [registration] sticker in the rear window" because in his experience "such stickers sometimes belonged to a different vehicle or had been falsified." (*Id.* at p. 271.) The officer obtained the driver's license and asked the defendant, a passenger, to identify himself. (*Id.* at pp. 265-266.) After verifying that the defendant was "a parolee at large and had an outstanding no-bail warrant for his arrest," the officer arrested him. (*Id.* at p. 266.) During an ensuing search, police found a syringe cap on defendant, drugs and paraphernalia on the driver, and methamphetamine manufacturing materials in the backseat of the car. (*Ibid.*)

Our high court determined that the officer's misconduct was not flagrant, concluding that although the officer lacked reasonable suspicion "to justify a temporary detention to permit further investigation, the insufficiency was not so obvious as to make one question [the officer's] good faith in pursuing an investigation of what he believed to be a suspicious registration, nor does the record show that he had a design and purpose to effect the stop 'in the hope that something [else] might turn up.'"[8] (*Brendlin*, *supra*, 45 Cal.4th at p. 271.) "In particular, there [was] no evidence at all that the deputy 'invented a justification for the traffic stop in order to have an excuse to run [a] warrant check[]' [citation] or that a search of the vehicle or its occupants was the 'ultimate goal' of the initial unlawful detention. [Citations.]" (*Id.* at p. 272.) Rather, the court

---

[8] As in *Strieff*, the prosecution in *Brendlin* conceded that the stop was not supported by reasonable suspicion of criminal activity. (*Brendlin*, *supra*, 45 Cal.4th at p. 268.)

characterized the circumstance as " 'a chance discovery of an outstanding arrest warrant' in the course of a seizure that [was] later determined to be invalid." (*Ibid.*)

We conclude similarly here. Officer Croucher testified that he approached and spotlighted defendant's vehicle as part of his investigation into a security guard's report of a "possible vehicle burglary," and after he learned from the guard that two individuals on bicycles were using flashlights to look into cars. Defendant's vehicle was suspicious to Officer Croucher because "it was in a dark area," parked in the lot of what the officer believed to be a closed business. The security guard had directed Officer Croucher to the lot. The other few vehicles in the lot were unoccupied, the buildings were dark, and no one was walking in the lot. Officer Croucher stated that he suspected defendant "may or may not have been related to the subjects that we were looking for" and that he "inten[ded] to detain [defendant] based on a reasonable suspicion." Officer Croucher searched defendant's vehicle only after he learned defendant was on parole.

There is no evidence that Officer Croucher's actions were "pretextual or in bad faith" (*Brendlin*, *supra*, 45 Cal.4th at p. 271) or any "indication that this [detention] was part of any systemic or recurrent police misconduct" (*Strieff*, *supra*, 136 S.Ct. at p. 2063). As in *Brendlin*, "there is no evidence at all that [Officer Croucher] 'invented a justification' " to detain defendant " 'in order to have an excuse to run [a] [records] check' [citation] or that a search of the vehicle or [defendant] was the 'ultimate goal' of the initial . . . detention. [Citations.]" (*Brendlin*, *supra*, at p. 272.) Rather than pursuing a fishing expedition, Officer Croucher was conducting an investigation based on a 911 call reporting "a possible vehicle burglary" in an adjacent parking lot.

Defendant argues that "this was not a case involving a good faith mistake by the officer, but rather a flagrant example of a detention made without any reasonable basis for the officer to have articulable suspicion that [defendant] was engaged in any wrongdoing." However, "[f]or the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." (*Strieff*,

*supra*, 136 S.Ct. at p. 2064, citing *Kaupp v. Texas* (2003) 538 U.S. 626, 628, 633 [finding flagrant misconduct where police arrested the defendant in his home after they were denied a warrant and at least some of the officers "were conscious that they lacked probable cause to arrest"].) Defendant points to no police misconduct here apart from the lack of reasonable suspicion to detain.

As in *Strieff*, Officer Croucher was investigating a report of suspected criminal activity. (See *Strieff*, *supra*, 136 S.Ct. at p. 2059.) A security guard had called 911 to report "a possible vehicle burglary." The guard relayed to Officer Croucher when he arrived on scene that there were two "suspicious individuals on bikes" using flashlights to look into cars. Officer Croucher then observed defendant fully reclined in the passenger seat of a car parked in a dark lot the security guard directed him to, which was adjacent to the parking lot where the guard had seen the suspicious individuals. No other people were in the lot and the businesses were seemingly closed. Officer Croucher felt he "had reasonable suspicion, based on what the security guard told [him], that [defendant] may or may not have been related to the subjects that we were looking for."

Although Officer Croucher's belief that he had legal cause to detain defendant "was mistaken, his conduct thereafter was lawful." (*Strieff*, *supra*, 136 S.Ct. at p. 2063.) Officer Croucher's uncontested decision to run a criminal history check using defendant's name and date of birth "was a 'negligibly burdensome precautio[n]' for officer safety." (*Ibid.*; see also *People v. Lopez* (2019) 8 Cal.5th 353, 363 & fn. 4.) His subsequent search of defendant was lawful because defendant was on parole. (§ 3067, subd. (b)(3).)

Thus, because there is no evidence that Officer Croucher's actions were pretextual, in bad faith, or part of recurrent police misconduct, we determine that Officer Croucher's conduct was neither flagrant nor purposeful. (See *Strieff*, *supra*, 136 S.Ct. at p. 2063; *Brendlin*, *supra*, 45 Cal.4th at p. 271.)

### 4. *Durant* and *Bates*: Application of the Attenuation Doctrine Pre-*Strieff* to the Discovery of a Suspect's Search Condition

The Courts of Appeal have considered whether the postdetention discovery of a search condition constituted an intervening circumstance for attenuation purposes. In *People v. Durant* (2012) 205 Cal.App.4th 57, 66 (*Durant*), the officer had stopped the defendant earlier on the same day as the detention at issue and learned at that time that the defendant was on probation with search conditions. (*Id.* at pp. 60-61.) Later that day, the officer activated his patrol car's lights after observing what he believed to be a traffic violation and was then alerted by his partner that the driver, the defendant, was the person he had stopped earlier. (*Id.* at p. 61.) A search of the defendant's person produced a handgun. (*Ibid.*) The First District Court of Appeal determined that "any illegality in the initial traffic detention was attenuated by [the defendant's] probation search condition," in part because "[t]he search condition supplied legal authorization to search that was completely independent of the circumstances leading to the traffic stop" and the officer was aware of the condition before the search. (*Id.* at p. 66.)

In *Bates*, a different panel of this court chose not to "adopt" *Durant*'s reasoning and concluded that the defendant's probation search condition was an insufficient attenuating circumstance to remove the taint from the unlawful stop based on the facts before the court. (*Bates*, *supra*, 222 Cal.App.4th at p. 69; see *id.* at pp. 69-71.) There, sheriff's deputies were investigating a reported theft by a Black male wearing navy blue clothing and driving a gold van. (*Id.* at p. 63.) One of the deputies learned that the defendant matched the suspect's general description and was on felony probation with a search condition. (*Ibid.*) The deputy directed another deputy to drive to the defendant's apartment complex and "stop the gold van used by [the] defendant's family if he saw it leave the complex." (*Ibid.*) A couple hours after the theft was reported, the deputy at the defendant's apartment complex stopped a tan car exiting an adjacent mobilehome park after it was broadcast on the radio "that a person matching the assailant's general

19

description was walking west toward the mobilehome park." (*Id.* at p. 63.) "[T]he sole observation [the deputy] made about the tan car was that there were people in it. Though the testimony [was] vague, it appears that when he stopped the car he could see a White female driver, a Black male in the front passenger seat, and a third passenger in the backseat." (*Id.* at p. 64.) The *Bates* court determined that the detention was unlawful and held that the defendant's probation search condition was not an intervening circumstance given the facts before the court, which involved purposeful officer misconduct. (*Id.* at pp. 67, 69-71; see also *People v. Kidd* (2019) 36 Cal.App.5th 12, 22-23 [citing *Bates* and stating that "[i]f the People had raised the issue [of attenuation], we would not have found [the defendant's] parole search condition served to attenuate the taint of the illegal detention"].)

The *Bates* court did "not read *Durant* to stand for the proposition that discovery after the fact of a probation search condition will sanitize any unlawful detention without regard to the circumstances surrounding that seizure." (*Bates*, *supra*, 222 Cal.App.4th at p. 70.) The *Bates* court found that "[a] probation search condition . . . is a discretionary enforcement tool and therefore a less compelling intervening circumstance than an arrest warrant," and observed that *Durant*'s "intervening circumstances analysis proceeds on the implicit assumption that a probation search condition is the same as the arrest warrant present in *People v. Brendlin*." (*Bates*, *supra*, at p. 70.)

The *Bates* court expressed concern "with applying *Durant* to the facts [before it], as doing so would open the door to random vehicle detentions for the purpose of locating probationers having search conditions." (*Bates*, *supra*, 222 Cal.App.4th at p. 70.) While *Bates* took "no issue with the lawfulness of probation search conditions, nor with the ability of law enforcement to conduct suspicionless searches of known probationers," the court stated its "discomfort . . . in extending these concepts to situations where an individual's probation status is wholly unknown to law enforcement at the time of the

initial detention and is used only after the fact to justify an otherwise unlawful search." (*Ibid.*)

We distinguish *Bates* on its facts. Unlike the case before us, *Bates* did not involve a search that occurred only after the officer coincidentally discovered a search condition following an unlawful detention. Instead, in *Bates*, the deputy, who was looking for the defendant and apparently knew that he was on probation with a search condition, stopped a car similar, but not a match, to the perpetrator's van without knowing the defendant was in it a couple hours after the crime was reported, demanded identification, and upon learning the defendant's identity, seized the defendant's person. (*Bates*, *supra*, 222 Cal.App.4th at pp. 63-64.) We read the *Bates* decision as declining to find that the defendant's probation search condition was an intervening circumstance given the officer's purposeful misconduct and the fact that the officer's postdetention actions were not compelled, as would have been the case with an arrest warrant. (*Id.* at pp. 70-71; see *Strieff*, *supra*, 136 S.Ct. at p. 2063 [observing that the defendant's arrest "was a ministerial act that was independently compelled by the pre-existing warrant"].)

We conclude that a parole search condition may constitute an intervening circumstance depending on the facts of the case. The three attenuation factors must be weighed. While a search condition, which provides discretion to the officer, is different from an arrest warrant, which compels an officer to make an arrest, it may constitute an intervening circumstance that can support a finding of attenuation where, as here, there is no evidence of flagrant misconduct.

Although the *Bates* court expressed "discomfort" in the after-the-fact use of a probation search condition unknown at the time of the initial illegal detention "to justify an otherwise unlawful search" (*Bates*, *supra*, 222 Cal.App.4th at p. 70), we observe that any intervening circumstance analyzed under the attenuation doctrine necessarily arises *after* unlawful police conduct. As stated, "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." (*Hudson*,

21

*supra*, 547 U.S. at p. 592.)  And while we understand the *Bates* court's concern regarding "random vehicle detentions" (*Bates*, *supra*, at p. 70), such detentions would likely qualify as flagrant police misconduct under the third attenuation factor and mandate suppression of the evidence obtained during the ensuing searches (see *Strieff*, *supra*, 136 S.Ct. at p. 2064; *Brendlin*, *supra*, 45 Cal.4th at p. 272).

In *Strieff*, the Supreme Court rejected the contention that the prevalence of outstanding arrest warrants would lead to "dragnet searches," observing that the attenuation factors "take account of the purpose and flagrancy of police misconduct. Were evidence of a dragnet search presented . . . , the application of the . . . factors could be different." (*Strieff*, *supra*, 136 S.Ct. at p. 2064.)  Likewise, in *Brendlin*, our high court disagreed with the defendant's contention that suppression was "necessary to deter the police from randomly stopping citizens for the purpose of running warrant checks," because "[w]here [a] seizure is flagrantly or knowingly unconstitutional or is otherwise undertaken as a fishing expedition, the third . . . factor will make it unlikely that the People would be able to demonstrate an attenuation of the taint of the initial unlawful seizure." (*Brendlin*, *supra*, 45 Cal.4th at p. 272.)  Importantly, "[t]he exclusionary rule exists to deter police misconduct," and it is "[t]he third factor of the attenuation doctrine [that] reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." (*Strieff*, *supra*, at p. 2063.)

### 5. Conclusion

Based on the principles articulated in *Strieff* and *Brendlin* and our weighing of the three attenuation factors as applied to the facts here, we determine that Officer Croucher's discovery of defendant's parolee status sufficiently dissipated any taint from the unlawful detention.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Although Officer Croucher presumably conducted the search shortly after he detained defendant, the search occurred only after Officer Croucher learned defendant

22

was on parole. Defendant's status as a parolee predated and was unconnected to the detention, supplied independent legal authorization for the search, and was not subject to interpretation. (See *Strieff*, *supra*, 136 S.Ct. at p. 2062; *Brendlin*, *supra*, 45 Cal.4th at p. 271; see also *Durant*, *supra*, 205 Cal.App.4th at p. 66.) Those circumstances, coupled with the significant fact that Officer Croucher did not engage in flagrant or purposeful misconduct, lead us to conclude that suppression is unwarranted. (See *Strieff*, *supra*, at pp. 2062-2063; *Brendlin*, *supra*, at pp. 271-272.)

Accordingly, because Officer Croucher's discovery of defendant's parolee status attenuated the connection between the detention and the evidence seized during the parole search, the motion to suppress was properly denied.

## IV.  DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, J.

I CONCUR:

_____

ELIA, ACTING P.J.

***People v. McWilliams***
**H047253**

Danner, J., concurring and dissenting.

I respectfully disagree with the majority's conclusion that the trial court did not err in denying McWilliams's motion to suppress. I agree that Officer Croucher had no reasonable suspicion that McWilliams had committed a crime and join the majority's analysis of that question. (Maj. opn. *ante*, at pp. 7–11.) However, in my view the immediate discovery of McWilliams's parole status did not dissipate the taint of the illegal detention—to the contrary, it was a direct and predictable consequence of it. Therefore, I would conclude that the trial court erred in denying the motion to suppress and would reverse the judgment.

As the majority recognizes, the prosecution bears the burden of demonstrating a legal justification for the officer's warrantless search. (*People v. Redd* (2010) 48 Cal.4th 691, 719; see also *People v. Bower* (1979) 24 Cal.3d 638, 644.) The burden includes demonstrating sufficient attenuation to purge the taint of unlawful conduct. (*People v. Boyer* (2006) 38 Cal.4th 412, 449; *Dunaway v. New York* (1979) 442 U.S. 200, 218; *Brown v. Illinois* (1975) 422 U.S. 590, 604.)

In the present case, there is no dispute that Officer Croucher detained McWilliams at the moment he instructed McWilliams to get out of his vehicle. Croucher testified that, for "officer safety," he would give this instruction to exit the vehicle during "most car stops . . . or most suspicious vehicles that [he] c[a]me across." At that point, with a spotlight trained on him and two officers standing nearby, McWilliams would not have reasonably felt free to leave the parking lot. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 341.)

I agree with the majority that the facts as found by the trial court do not support a conclusion that Officer Croucher when he detained McWilliams had a reasonable articulable suspicion that McWilliams may have been involved in criminal activity. However, I disagree with the majority that we should not therefore apply the usual

remedy to such a violation of the Fourth Amendment—namely suppression of any evidence gained in the subsequent search.

After Officer Croucher ordered McWilliams out of his vehicle, Croucher asked McWilliams for identification, which McWilliams then retrieved from the car with Croucher's permission. Croucher conducted a records check and learned that McWilliams was "on active and searchable CDC[R] parole." The district attorney did not present any evidence at the suppression hearing regarding the actions that Officer Croucher and his fellow officer took after they learned McWilliams was on parole. It is also noteworthy that the district attorney did not assert in the trial court the application of the attenuation doctrine. The majority opinion, therefore, affirms the trial court on a basis that was arguably not preserved for appeal and about which the prosecution elicited little evidence. (See *People v. Nottoli* (2011) 199 Cal.App.4th 531, 560–561 & fn. 14 ["Under California law . . . the People generally may not raise on appeal a new theory that was not raised at the original suppression hearing."]; cf. *People v. Brendlin* (2008) 45 Cal.4th 262, 267, fn. 1 (*Brendlin*).)

Nevertheless, the majority concludes—as urged by the Attorney General on appeal—that the parole search was sufficiently attenuated from the illegal detention because the search occurred after Officer Croucher learned of McWilliams's unrelated parole status, and there is no indication that Croucher intended to perform a search when he approached McWilliams's vehicle. (Maj. opn. *ante*, at pp. 5, 14–15.)

I agree with the majority that the first attenuation factor—temporal proximity between the unlawful detention and the discovery of the evidence—supports application of the exclusionary rule because there is no evidence that " 'substantial time' " elapsed between the detention and search of McWilliams's vehicle. (See *Utah v. Strieff* (2016) 136 S.Ct. 2056, 2062 (*Strieff*).)

As for the second factor—the presence of intervening circumstances—in my view, the officers' discovery of McWilliams's parole status after the detention and before

2

conducting the vehicle search does not constitute an intervening circumstance sufficient to overcome the taint of the illegal detention. "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence." (*Strieff*, *supra*, 136 S.Ct. at p. 2061.) In *Strieff*, the Supreme Court concluded that the discovery of a valid arrest warrant—resulting from a request for identification and records check during a pedestrian stop—was an intervening circumstance that "strongly favors the State." (*Id*. at p. 2062.) The court explained that a warrant is a "judicial mandate" (*id*. at p. 2062) that an officer has a "sworn duty" (*ibid*.) to carry out, and the "arrest of Strieff thus was a ministerial act that was independently compelled by the pre-existing warrant." (*Id*. at p. 2063.) The decision to arrest Strieff was not a discretionary one made by the officer, and "it was undisputedly lawful to search Strieff as an incident of his arrest to protect [the officer's] safety." (*Ibid*.) Similarly, in *Brendlin*, in which the California Supreme Court upheld the application of the attenuation doctrine to an intervening circumstance of a valid arrest warrant, the court observed that "[a] warrant is not reasonably subject to interpretation or abuse." (*Brendlin*, *supra*, 45 Cal.4th at p. 271.)

McWilliams's parole status and attendant suspicionless search condition admittedly predated the detention and were otherwise unconnected to Officer Croucher's initial actions. However, McWilliams's parole status differs from that of a person subject to an arrest warrant because a parole search condition is "a discretionary enforcement tool and therefore a less compelling intervening circumstance than an arrest warrant." (*People v. Bates* (2013) 222 Cal.App.4th 60, 70 (*Bates*).)

Because a suspicionless parole search is reasonably subject to abuse by law enforcement (cf. *Brendlin*, *supra*, 45 Cal.4th at p. 271), the existence of discretion, combined with the seemingly routine nature of Officer Croucher's request that McWilliams produce his identification for a records check, leads me to conclude that the intervening circumstance (i.e., discovery of McWilliams's parole status) does not break the causal chain here. Rather, it was foreseeable that the detention and routine records

3

check could result in discovery that McWilliams was on parole (or probation) and thus subject to a suspicionless search condition, given that more than half a million people are under parole or probation supervision in California. " 'California's adult supervised probation population is around 548,000 – the largest of any state in the nation, more than twice the size of the state's prison population, almost four times larger than its jail population and about six times larger than its parole population.' " (*People v. Quinn* (2021) 59 Cal.App.5th 874, 879–880; see also *id.* at p. 880 [" '[L]ike incarceration, probation affects already marginalized populations in troubling ways. Black Americans make up 13% of the U.S. adult population, but 30% of those under community supervision.' "].)

In *Brendlin*, the California Supreme Court stated, " 'It is only in the unusual case where the police, after a questionable stop, discover that an occupant is wanted on an arrest warrant that the intervening circumstances exception will apply.' " (*Brendlin*, *supra*, 45 Cal.4th at p. 272.) Given the number of people under criminal supervision in California, this characterization of exceptional circumstance loses its force in the context of a probation or parole search. Therefore, I would conclude that the discovery of McWilliams's parole status is a link in the chain between his unlawful detention and the search of his vehicle, not a sufficient intervening cause that weighs measurably against suppression. (See *United States v. Garcia* (9th Cir. 2020) 974 F.3d 1071, 1077–1080.)

Regarding the third, " 'particularly significant' " factor (*Strieff*, *supra*, 136 S.Ct. at p. 2062)—the purpose and flagrancy of the official misconduct—this factor "favor[s] exclusion only when the police misconduct is most in need of deterrence." (*Id.* at p. 2063.) The purpose of the exclusionary rule itself, of course, is to deter violations of the Fourth Amendment. "The [exclusionary] rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." (*Elkins v. United*

*States* (1960) 364 U.S. 206, 217; see also *Davis v. United States* (2011) 564 U.S. 229, 236–237.)

In my judgment, the district attorney did not present sufficient evidence to support application of the attenuation doctrine here. The line between the illegal detention and the officer's search is both short and direct. I recognize that Officer Croucher testified that he thought there was reasonable suspicion McWilliams "may or may not have been related to" the two bicycle riders, and the trial court concluded there was reasonable suspicion for the detention and further investigation. However, the objective justification for the detention of McWilliams was exceedingly minimal. I see no constitutionally appropriate basis for a conclusion that a man reclining in a car in the early evening hours in a public parking lot may be involved in criminal activity.

In addition, Officer Croucher admitted that he ordered McWilliams out of his car in accordance with Croucher's typical practice when confronting a suspicious vehicle. Croucher also immediately requested identification from McWilliams's to conduct a records check. Croucher did not explain why he asked McWilliams for identification or why he did not run a check on the license plate or engage McWilliams in conversation about the reported possible vehicle burglary. Either Croucher did not understand the Fourth Amendment standard (a conclusion which itself supports application of the exclusionary rule) or he unlawfully detained McWilliams and requested identification " ' "in the hope that something might turn up." ' " (*Bates*, *supra*, 222 Cal.App.4th at pp. 70-71.) Again, such an action would call for application of the exclusionary rule, rather than deny the need for its deterrent effect.

The majority concludes that Officer Croucher's conduct was not flagrant because it was not "pretextual, in bad faith, or part of recurrent police misconduct." (Maj. opn. *ante*, at p. 18.) I respectfully disagree that the officer's actions here do not raise a broader issue of police misconduct.

5

Officer Croucher was essentially on a fishing expedition when he turned into the parking lot next to the one from which the security guard reported two people on bicycles had been looking into cars. Any concerns about officer safety here arose from Croucher's own actions in deciding to approach McWilliams's car. McWilliams was sleeping or lying in his car early in the evening in a public parking lot, which itself raises no concerns about criminal activity. It bears emphasizing that there was no particular exigency supporting Croucher's actions—the original report itself lacked any observation of an actual crime.

If Officer Croucher were concerned about McWilliams's safety, he could have asked McWilliams about it. Instead he shined his spotlight on McWilliams and ordered him out of the car. Croucher then told McWilliams to retrieve his identification from his car (seemingly in contradiction to Croucher's expressed fears of officer safety, presumably about the potential presence of a hidden weapon) and checked on McWilliams's status. Croucher's testimony was that ordering people out of vehicles is his routine practice when making vehicle stops or checking on suspicious vehicles. But if the detention itself is illegal—which this one was—then the subsequent search is a direct and inevitable consequence of the officer's illegal action.

In the majority's view, the officer's conduct was not a flagrant violation of the Fourth Amendment. I would agree that, viewed solely in isolation and without any consideration of larger context, Officer Croucher could have made an honest mistake that does not necessarily call for application of the exclusionary rule. However, there is a growing recognition that seemingly small constitutional violations can add up to problems of significant national dimensions. As recently stated by a colleague on another Court of Appeal, "Nearly a century ago Justice Benjamin Cardozo wrote: 'The great tides and currents which engulf the rest of men do not turn aside in their course and pass the judges by.' [Citation.] Nor should they. As our broader cultural views on racial injustice evolve, courts and judges are compelled to acknowledge and confront the

6

problem. (See, e.g., *B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 31 [471 P.3d 329] (conc. opn. of Liu, J.) [citing 'the troubling racial dynamics that have resulted in state-sanctioned violence, including lethal violence, against Black people throughout our history to this very day']; *Utah v. Strieff* (2016) . . ., 136 S.Ct. 2056, 2070–2071] (dis. opn. of Sotomayor, J.) ['it is no secret that people of color are disproportionate victims of this type of scrutiny' in suspicionless stops].)" *In re Edgerrin J.* (2020) 57 Cal.App.5th 752, 770–771 (conc. opn. of Dato, J.).)[1]

Although *Brendlin*—itself decided more than twelve years ago and under quite different circumstances—supports the majority's decision, it does not compel it. And certainly, the California and United States Supreme Court have shown themselves willing to reconsider Fourth Amendment doctrines when considering the proper balance between law enforcement and privacy interests. (See, e.g., *People v. Lopez* (2019) 8 Cal.5th 353, 365; *People v. Ovieda* (2019) 7 Cal.5th 1034, 1038.)

Officer Croucher made a number of discretionary decisions here, none of which was dictated by any direct evidence of criminal activity or supported by any particular exigency or danger. The officer's decisions led to an illegal detention and a search of someone who had done nothing more than—as far the officer knew—reclined his seat in a car in a public parking lot in the early evening. In my view, the close connection between the illegal detention and the search, the absence of any reasonable suspicion of criminal activity, the lack of any exigency or emergency, the highly discretionary actions of the officer, and the officer's own description of his actions as part of his regular practice all counsel against application of the attenuation doctrine. On this record, the trial court should have granted the motion to suppress.

---

[1] The race of McWilliams himself is not established by the record on appeal, although presumably it was known to those involved in the proceedings in the trial court. The issue with respect to application of the attenuation doctrine under these circumstances is the uncontrolled exercise of discretion by the police and concomitant concerns about the influence of bias, whether explicit or unconscious.

For these reasons, I respectfully dissent from the majority's decision to affirm the judgment.

_____
Danner, J.

**H045525**
*People v. McWilliams*