Filed: 12/12/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037910 |
| | (Santa Cruz County |
| Plaintiff and Respondent, | Super. Ct. No. F20171) |
| v. | |
| MARCUS TAYLOR BATES, | |
| Defendant and Appellant. | |

In this appeal we conclude that the unlawfulness of a suspicionless vehicle detention is not retroactively cured when one of the passengers turns out to be a probationer with a search condition.

Defendant Marcus Taylor Bates pleaded no contest to felony grand theft from a person (Penal Code, § 487, subd. (c)) after he unsuccessfully moved to suppress evidence resulting from a traffic stop.[1] For the reasons stated herein, we will reverse the Superior Court's denial of defendant's motion.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The following factual background is derived from the testimony of Deputies Russell Skelton and Robert Gidding at the hearing on defendant's suppression motion. On December 13, 2010, at approximately 1:15 p.m., deputy sheriffs responded to a disturbance involving two males and one female near the corner of Soquel Drive and 41st Avenue in Soquel. Deputies Skelton and Gidding, as well as other deputies, arrived at

---

[1] Defendant also admitted a prior strike conviction. (Pen. Code, § 667, subd. (a)(1).) Pursuant to a plea agreement, he was sentenced to a 32-month prison term (the lower term doubled for the prior strike).

the same time and interviewed the three people present. One of the individuals, Kyle Shelton, reported that his cellular phone had been taken from him. The theft occurred near the corner of Soquel Drive and Robertson Road, approximately 300 yards from the 41st Avenue location.

Shelton described the assailant to Deputy Skelton as a black male, just older than high school age, wearing a navy blue shirt, navy blue pants, and a navy blue jacket. Shelton also told the deputy he had seen the assailant around the area before, and that the assailant's name might be "Marcus." The other male present when the deputies arrived was Shelton's uncle, Michael Lesui, who recited Shelton's statements that the perpetrator threatened to shoot Shelton if he did not give up his phone and that the perpetrator drove a gold van.

Deputy Fenster, who also responded to the disturbance call, learned that defendant was a felony probationer who matched the general description of the assailant and lived in a nearby apartment complex. After learning defendant's probation terms included a warrantless search condition, Deputy Fenster directed Deputy Gidding to drive to the apartment complex where defendant lived and to stop the gold van used by defendant's family if he saw it leave the complex.

At approximately 3:00 p.m., deputy sheriffs, including Deputies Fenster and Skelton, arrived at the apartment complex to search defendant's residence. Deputy Skelton testified that as he was walking toward the complex, he saw a black male adult between 5 feet 9 inches and 6 feet tall wearing a blue sweatshirt walking beside the fence separating the apartment complex from an adjacent mobile home park. After Deputy Skelton lost sight of the individual, he informed the other deputies over the radio that a person matching the assailant's general description was walking west toward the mobile home park. Based on that information and a statement from another deputy that the person walking could be Marcus Bates, Deputy Gidding drove part way through the mobile home park and stopped his patrol car on the side of the park's single access road.

2

Within two minutes of Deputy Skelton's radio broadcast, Deputy Gidding noticed a tan car driving toward the park's exit. Deputy Gidding got out of his patrol car and signaled the car to stop.

Deputy Gidding's method of stopping the tan car is unclear from the record. The trial court indicated Deputy Gidding started to raise his hand when testifying in court about stopping the tan car, suggesting he made the same gesture when he pulled the car over. However, the trial court did not specifically make a finding on this point. According to Deputy Gidding's testimony, the sole observation he made about the tan car was that there were people in it. Though the testimony is vague, it appears that when he stopped the car he could see a white female driver, a black male in the front passenger seat, and a third passenger in the back seat. Deputy Gidding testified that he had not seen a photograph of defendant and did not know what defendant looked like, beyond the general information given by the victim.

When Deputy Gidding approached the tan car, he noticed the passenger in the back seat was also a black male. After he told the occupants he was investigating a crime and asked them for identification, the passenger in the back seat identified himself as "Marcus Bates." He was wearing a blue zip-up hooded jacket, a blue shirt, and blue jeans. Deputy Gidding asked him to get out of the car and placed him in handcuffs.

Defendant moved to suppress all evidence obtained as a result of Deputy Gidding's stop of the tan car, arguing the stop violated the Fourth Amendment. The trial court denied the motion, finding no show of authority by the deputy and "[i]t may well be that [the driver of the tan car] stopped completely voluntarily." Based on defendant's probation search condition, the trial court determined the deputies were entitled to detain and search defendant when he identified himself. Alternatively, the court found that even if the stop was not voluntary, it was nonetheless a lawful investigatory detention.

3

## II.  DISCUSSION

We divide our discussion into two parts: (1) whether Deputy Gidding's stop of the tan car violated the Fourth Amendment; and, if so, (2) whether defendant's probation search condition served to attenuate the taint of a Fourth Amendment violation.

### A.  CONSTITUTIONALITY OF THE INVESTIGATORY STOP

Rulings on suppression motions present mixed questions of law and fact.  (*People v. Hernandez* (2008) 45 Cal.4th 295, 298-299.)  We review the trial court's factual determinations for substantial evidence.  However, we review de novo the trial court's application of the law to the facts.  (*Id.* at p. 299.)  The constitutionality of the investigatory stop here depends on whether the tan car stopped in response to a show of authority by Deputy Gidding and, if so, whether the investigatory stop was a lawful detention.

### 1.  Deputy Gidding Stopped the Tan Car Under a Show of Authority

Not all interactions between law enforcement and members of the public rise to the level of "seizures" implicating the Fourth Amendment.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.)  For a seizure to occur, an officer must intentionally restrain an individual's freedom of movement either physically or through a show of authority. (*Ibid.*, citing *Brendlin v. California* (2007) 551 U.S. 249, 254.)  A seizure through a show of authority occurs when a reasonable person would not believe he or she is free to leave or to decline an officer's request.  (*Zamudio, supra,* at p. 341.)  The reasonableness of an officer's conduct must be viewed in light of all the circumstances surrounding the incident.  (*Ibid.*, citing *Brendlin v. California*, *supra*, 551 U.S. at p. 255.)

In making its factual findings, the trial court described that Deputy Gidding "started to put his hand up in court" when testifying about stopping the tan car, suggesting an inference that the deputy may have raised his hand when he actually stopped the car.  However, the trial court determined that such a gesture was not a show

of authority and that no other action by Deputy Gidding constituted a show of authority. On appeal, defendant argues the tan car stopped in response to the deputy's show of authority. We agree.

When Deputy Gidding stopped the car, he was in uniform and standing near a patrol car. Although not blocking the road, the patrol car was stopped along the route of the tan car's only exit from the park. Further, Deputy Gidding himself described more than once at the suppression hearing, "I stopped the car."

Deferring to the trial court's factual findings, we apply them in our analysis of the stop at issue here and conclude that a reasonable person would not have believed he or she was free to leave or not comply with the deputy's directives. A reasonable driver would not feel free to ignore a uniformed officer standing next to a patrol car, possibly gesturing with a raised hand, and would feel compelled to stop. While not dispositive, Deputy Gidding's repeated statement that he stopped the car shows he intended to stop the car and suggests that whatever gesture he may have made with his hand would lead a reasonable person under all circumstances to infer a show of authority. We conclude Deputy Gidding seized the tan car and its occupants for purposes of the Fourth Amendment, and we must therefore determine whether the seizure was lawful.

### 2. The Detention of the Tan Car was Unlawful

The Fourth Amendment and the California Constitution protect individuals against unreasonable searches and seizures. (*Hernandez*, *supra*, 45 Cal.4th at p. 299; *People v. Camacho* (2000) 23 Cal.4th 824, 830 ["since voter approval of Proposition 8 in June 1982, state and federal claims relating to exclusion of evidence on grounds of unreasonable search and seizure are measured by the same standard"].) Detention of the tan car would be reasonable under the Fourth Amendment if there were "specific articulable facts that, considered in light of the totality of the circumstances, provide[d] some objective manifestation that the person [or vehicle] detained may be involved in

5

criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.) The requirement of particularized suspicion does not allow officers to detain individuals or vehicles based on "mere hunches" or to stop vehicles solely to check the validity of a driver's license or car registration. (*Hernandez, supra*, 45 Cal.4th at p. 299.)

When he stopped the tan car shortly after 3:00 p.m., Deputy Gidding knew of the reported theft that had occurred some two hours earlier. He was aware that the suspect was a black male, slightly older than high school age, wearing a blue shirt, blue pants, and a blue jacket. Deputy Gidding also knew the suspect could be a man named Marcus Bates, a probationer living at a nearby apartment complex whose family drove a gold van which the deputy had been instructed to watch for. Deputy Gidding had heard Deputy Skelton's report of someone matching the suspect's general description walking away from defendant's apartment complex and toward an adjacent mobile home park.

Based on this information, Deputy Gidding immediately went to the mobile home park and stopped a tan car. When asked directly by the prosecutor at the suppression hearing why he stopped that car, the sole reason he gave was that "there were people in the car." Deputy Gidding never testified that he stopped the car because any of its occupants matched the suspect's description. He did not state that anything about the tan car or the way it was being driven gave rise to any suspicion of criminal activity. Nor did he testify that he knew a probationer named Marcus Bates was in the car, nor even that he knew what that probationer looked like.

From these facts, and considering them in light of the totality of the circumstances, we conclude the deputy had no reasonably articulable suspicion that either the occupants of the tan car or the car itself may have been involved in criminal activity. Instead, it appears Deputy Gidding made the stop based solely on the possibility that the suspect might be riding in the vehicle. It is logical to assume that a suspect might get into a vehicle to leave the location of a crime and its investigation. Without more, however, that assumption does not rise to the particularized suspicion necessary to detain the

vehicle and its occupants. Our conclusion is consistent with cases arising from detentions based solely on generalized suspicion. In *People v. Hernandez, supra*, 45 Cal.4th 295, the Supreme Court rejected the stop of a vehicle with a temporary operating permit because the officer had only a generalized suspicion that temporary permits are often invalid. (*Id.* at p. 300-301.)

Most of the authorities relied on by the People are distinguishable because they involved detentions where officers specifically recognized an individual or a vehicle as related to a crime. (*United States v. Hensley* (1985) 469 U.S. 221, 232 [traffic stop and detention lawful where officers recognized the individual from a wanted poster for a previous felony]; *People v. Williams* (1995) 33 Cal.App.4th 467, 476-477 [traffic stop and detention lawful where vehicle's license plate number was associated with outstanding traffic warrant]; *People v. Lazanis* (1989) 209 Cal.App.3d 49, 54 [traffic stop of white car with three passengers lawful where it occurred immediately after another officer reported a white car with three passengers had just left location of suspected burglary]; *In re William J.* (1985) 171 Cal.App.3d 72, 76-77 [traffic stop and detention lawful where police recognized a passenger and believed there was an outstanding arrest warrant for that passenger]; *People v. Fields* (1984) 159 Cal.App.3d 555, 564 [detention lawful where defendant matched suspect description containing unique distinguishing features including sex, height, race, age, and attire]; *People v. McCluskey* (1981) 125 Cal.App.3d 220, 226 [traffic stop and detention lawful where police observed passenger matching suspect's description before stopping the vehicle]; *United States v. Pagel* (7th Cir. 1988) 854 F.2d 267, 271 [detention of vehicle lawful where it was known to be property of parolee subject to search condition].)

In contrast, Deputy Gidding did not testify that any characteristic of the tan car or its passengers created a particularized suspicion they were associated with a crime. To the extent the People argue Deputy Gidding's description of the vehicle's front passenger as a black male created sufficient suspicion, the race of an occupant, without more, does

7

not satisfy the detention standard. (*People v. Bower* (1979) 24 Cal.3d 638, 644 [race alone cannot raise reasonable suspicion of criminal activity without additional identifying characteristics].) Similarly, the People's argument that defendant's probation search condition retroactively made the stop reasonable is without merit because Deputy Gidding did not know defendant was in the vehicle when he made the stop. (See *People v. Robles* (2000) 23 Cal.4th 789, 800 [advance knowledge of probation search condition required to make search reasonable]; see also *In re Marcellus L.* (1991) 229 Cal.App.3d 134, 149-150.)

Two other cases cited by the People merit greater attention, but are nonetheless distinguishable because they involve circumstances not present here. In *People v. Conway* (1994) 25 Cal.App.4th 385, an individual looked out his window just before 3:00 a.m. and saw two men, one "dark" and one white, leaving his garage with some of his belongings. (*Id.* at p. 387.) While his wife called the police, the individual pursued the two burglars and saw them driving away in a small Chevrolet. Meanwhile, a patrol car responding to the dispatch of the burglary in progress saw a brown compact car leaving the area of the burglary with two male occupants, one white and one black. Seeing no other vehicles on the road at that hour, deputies stopped the brown compact car and detained the occupants. An occupant of the brown compact car, who was convicted of the residential burglary, challenged the detention on appeal, claiming the officer did not have a reasonably articulable suspicion of criminal activity. The appellate court affirmed the lawfulness of the traffic stop and detention. (*Id.* at pp. 387-389.)

In finding a reasonably articulable suspicion of criminal activity, the *Conway* court focused on three details not present in the case before us. First, the traffic stop in *Conway* occurred less than two minutes after the officers received a dispatch of a burglary in progress. (*Conway, supra,* 25 Cal.App.4th. at p. 390.) Deputy Gidding's stop of the tan car took place shortly after defendant was seen near the mobile home park, but more than two hours after the theft occurred. Second, in *Conway* the deputy stopped the

brown compact car as it was leaving the immediate area of the burglary. (*Ibid.*) The tan car, on the other hand, was leaving a nearby residential complex rather than the location of the reported crime. Third, the traffic stop in *Conway* happened in the middle of the night when no other vehicles or individuals were present. (*Ibid.*) Deputy Gidding's mid-afternoon stop of the tan car is distinguishable because it is far more common for the general public to be driving in the afternoon than in the middle of the night.

The People also rely on *People v. Souza*, *supra*, 9 Cal.4th 224. In *Souza*, police in a high crime area noticed the defendant standing in the dark late at night talking to someone in a parked car. (*Id.* at p. 228.) When the police turned on a spotlight, the defendant ran and was then apprehended. (*Ibid.*) In upholding the denial of his motion to suppress evidence of narcotics discovered when the defendant was frisked, the court found no Fourth Amendment violation because the detention occurred in a high crime area, late at night, after the defendant exhibited suspicious behavior by standing next to a car in the darkness and then running from police. (*Id.* at p. 242.) No such circumstances are present in this case.

## B. DEFENDANT'S PROBATION SEARCH CONDITION

Having determined the investigatory stop was unlawful, evidence obtained as a result of the stop must be suppressed unless an intervening circumstance attenuated the Fourth Amendment violation. To determine if evidence is admissible despite a defect in the initial stop, we must decide " 'whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality.' " (*People v. Brendlin* (2008) 45 Cal.4th 262, 269, quoting *United States v. Crews* (1980) 445 U.S. 463, 471.) Three factors are used to determine whether the taint of the illegal detention has been attenuated: (1) the temporal proximity of the Fourth Amendment violation to the procurement of the challenged evidence; (2) the presence of

9

intervening circumstances; and (3) the flagrancy and purposefulness of the official misconduct. (*Ibid.*, quoting *People v. Boyer* (2006) 38 Cal.4th 412, 448.) In *People v. Brendlin*, police officers made an unlawful traffic stop of a car and, upon discovering that a passenger had an outstanding arrest warrant, conducted a search incident to arrest and found controlled substances. (*Id.* at pp. 265-266.) On remand from the United States Supreme Court,[2] the California Supreme Court held that the discovery of the arrest warrant constituted an intervening circumstance that attenuated the taint of the unlawful traffic stop. (*People v. Brendlin, supra,* at p. 271.)

The People argue defendant's probation search condition attenuated any taint associated with the illegal investigatory stop, relying on *People v. Durant* (2012) 205 Cal.App.4th 57 (*Durant*), whose reasoning we do not adopt. In *Durant*, police stopped the defendant's car for making a left turn at a stop light without signaling. During the stop, police learned the defendant was on felony probation with a search condition, searched the defendant, and found a loaded handgun. The defendant moved unsuccessfully to suppress evidence of the handgun, arguing the traffic stop was unlawful because the defendant did not break any laws by turning without signaling. (*Id.* at pp. 61-62.)

On appeal, the court noted the defendant's turn without signaling was not illegal, but the court did not reach the question of whether the traffic stop was unconstitutional. Instead, it decided that, even assuming the traffic stop was illegal, the defendant's probation search condition attenuated any taint. (*Durant, supra,* 205 Cal.App.4th at p. 64.) The *Durant* court's analysis followed the three factor test from *People v. Brendlin*, focusing particularly on the second factor-intervening circumstances-to find that the

_____

[2] The United States Supreme Court, in *Brendlin v. California, supra,* 551 U.S. 249, determined that Brendlin, as a passenger in the car the police stopped, was "seized" for Fourth Amendment purposes and had standing to challenge the constitutionality of the traffic stop, reversing a prior opinion by the California Supreme Court. (*Brendlin v. California, supra,* 551 U.S. at pp. 256-258.)

probation search condition was sufficient to attenuate any taint from an unlawful stop. Applying the third factor from *People v. Brendlin*, the court also noted that the officer made the stop based on a good faith belief that the defendant's conduct was illegal and not for any "arbitrary, capricious, or harassing" reason. (*Durant, supra,* 205 Cal.App.4th at pp. 64-66.)

The *Durant* court's intervening circumstances analysis proceeds on the implicit assumption that a probation search condition is the same as the arrest warrant present in *People v. Brendlin*. In the case of an arrest warrant, officers essentially have a duty to arrest an individual once the outstanding warrant is confirmed. (See *State v. Jones* (Kan. 2001) 17 P.3d 359, 361 [noting arrest warrant gives police "right and duty to arrest" person named in warrant]; cf. *Arizona v. Evans* (1995) 514 U.S. 1, 15 [quoting with approval trial court statement that officer would have been "derelict in his duty if he failed to arrest" individual subject to arrest warrant].) A probation search condition, on the other hand, is a discretionary enforcement tool and therefore a less compelling intervening circumstance than an arrest warrant.

We do not read *Durant* to stand for the proposition that discovery after the fact of a probation search condition will sanitize any unlawful detention without regard to the circumstances surrounding that seizure. We are not comfortable with applying *Durant* to the facts here, as doing so would open the door to random vehicle detentions for the purpose of locating probationers having search conditions. We take no issue with the lawfulness of probation search conditions, nor with the ability of law enforcement to conduct suspicionless searches of known probationers. Our discomfort is in extending these concepts to situations where an individual's probation status is wholly unknown to law enforcement at the time of the initial detention and is used only after the fact to justify an otherwise unlawful search.

The third factor from *People v. Brendlin*, flagrancy and purposefulness of police misconduct, "is considered the most important because it is tied directly to the rationale

11

underlying the exclusionary rule, deterrence of police misconduct." (*United States v. Reed* (7th Cir. 2003) 349 F.3d 457, 464-465.) Bad faith need not be shown for police misconduct to be purposeful. Instead, this factor is met "when officers unlawfully seize a defendant 'in the hope that something might turn up.' " (*United States v. Williams* (6th Cir. 2010) 615 F.3d 657, 670, quoting *Brown v. Illinois* (1975) 422 U.S. 590, 605.)[3] Unlike the officer in *Durant*, who stopped a car based on a perceived traffic violation, Deputy Gidding stopped the tan car without any observation of possible wrongdoing. As we discussed previously, Deputy Gidding's conduct was based on a hunch that defendant might be in the vehicle. Though we do not suggest Deputy Gidding acted in bad faith, we find his suspicionless stop of the tan car nonetheless purposeful for our attenuation analysis. Based on this finding, together with our determination that defendant's probation search condition was an insufficient attenuating circumstance, we conclude that the evidence obtained as a result of the detention and search should have been suppressed.

### III.      DISPOSITION

The judgment is reversed. The trial court shall vacate its order denying defendant's suppression motion, enter a new order granting that motion, and permit defendant to withdraw his plea. Because we reverse the judgment based on the suppression issue, we do not reach defendant's section 4019 conduct credits claim.

---

[3] The California Supreme Court's *Brendlin* factors are based on those set forth by the United States Supreme Court in *Brown v. Illinois*. (*People v. Brendlin*, *supra*, 45 Cal.4th at pp. 268-269.)

_____

Grover, J.

**WE CONCUR:**



_____

Premo, Acting P.J.



_____

Mihara, J.



*People v. Bates*
**H037910**

| Trial Court: | Santa Cruz County Superior Court, Case No.: F20171 |
|---|---|
| Trial Judge: | Hon. Paul P. Burdick |
| Attorneys for Plaintiff/Respondent:<br><br>The People | Laurence K. Sullivan<br>  Office of the Attorney General<br><br>John Michael Chamberlain<br>  Office of the Attorney General |
| Attorneys for Defendant/Appellant:<br><br>Marcus Taylor Bates | Matthew T. Bogosian<br>  Law Office of Matthew T. Bogosian<br><br>Sixth District Appellate Program |

*People v. Bates*
**H037910**