Filed 12/1/21  P. v. Rodriguez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAIME PHILLIP RODRIGUEZ,<br><br>    Defendant and Appellant. | D079046<br><br><br>(Santa Clara Super. Ct.<br>No. C1641175) |

APPEAL from an order of the Superior Court of Santa Clara County, Eric S. Geffon, Judge.  Affirmed.  Request for judicial notice denied.

Seth Flagsberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and Katie L. Stowe, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Jaime Phillip Rodriguez was apprehended in a residential neighborhood after parking his car. A search of his vehicle following his arrest yielded drug contraband. Rodriguez moved to suppress the evidence, arguing that Officer Eric Bachman of the San Jose Police Department lacked reasonable suspicion to detain him and claiming Bachman's discovery of an outstanding arrest warrant during the detention did not sufficiently attenuate the taint of the initial illegal detention. The trial court accepted Rodriguez's first argument but rejected his second, and he now appeals. For reasons we recently explained in *People v. Kasrawi* (2021) 65 Cal.App.5th 751 review granted, S270040 (*Kasrawi*),[1] federal and state Supreme Court authorities compel our conclusion that even if the initial detention was unlawful, the evidence need not be suppressed. As the trial court found, Officer Bachman's discovery of the arrest warrant during the allegedly unlawful detention attenuated any taint that would otherwise attach to his subsequent search of Rodriguez's vehicle. Accordingly, we affirm the trial court's order denying Rodriguez's motion to suppress.

FACTUAL AND PROCEDURAL BACKGROUND

Around 3:40 a.m. on April 14, 2016, Bachman was patrolling a residential area in San Jose in his marked police vehicle. The headlights on Bachman's vehicle illuminated the area in front of him. He observed a car proceeding normally on Pedro Street near the Northrup Street intersection; the car pulled over to the right and parked legally alongside the curb. The

---

[1] The Supreme Court granted review in *Kasrawi* on September 1, 2021, S270040 pending disposition of the following issue in *People v. Tacardon* (2020) 53 Cal.App.5th 89, review granted October 14, 2020, S264219: "Was defendant unlawfully detained when the arresting officer used his spotlight to illuminate defendant's parked car and then directed a passenger who exited the car to remain outside and stay on the sidewalk near the car?"

intersection of Pedro and Northrup is not busy; both are two-lane roads with one lane going in each direction of travel. Bachman continued on Pedro Street. When he approached the parked vehicle, he noticed its sole occupant, Rodriguez, sitting in the driver's seat. Bachman turned on his spotlight to illuminate the vehicles parked on the south side of Pedro Street and parked in the middle of the street near Rodriguez's vehicle. There appeared to be no other people around.

Dressed in his uniform, Bachman exited his patrol vehicle and walked toward Rodriguez's car. As he approached, Rodriguez stepped out. Standing five to seven feet from him, Bachman struck up a conversation. " 'Hey, what's up?' " he asked. Rodriguez replied, " 'I just got off of work.' " Bachman asked Rodriguez if he lived nearby; Rodriguez responded that he lived around the corner on Northrup. Bachman asked whether Rodriguez had parked there because there was no parking on Northrup; Rodriguez answered, " 'Yeah.' "

As they spoke, Bachman observed that Rodriguez was sweating, fidgeting, moving around, and speaking rapidly. He believed Rodriguez to be under the influence of a controlled substance. At that point, Bachman asked Rodriguez for identification. Rodriguez told him he did not have any on him but verbally provided his name and date of birth. Bachman dialed into the San Jose Police Department's communications unit, which ran a records check. The query revealed that Rodriguez had a suspended license and was subject to an outstanding arrest warrant. The dispatcher did not provide the docket number for the warrant, but Bachman obtained it later as he wrote up his report.

Having learned about the warrant and suspended license, Bachman attempted to handcuff Rodriguez. Rodriguez became a bit argumentative,

and another officer arrived to help place him into handcuffs.  At the time of arrest, Bachman observed that Rodriguez had fluttering eyelids, dilated pupils that were nonreactive to light, and an elevated pulse.

Soon after arresting Rodriguez, Bachman searched his person and his vehicle.  The vehicle search yielded two baggies in the driver's side area containing a white, powdery residue and additional baggies in the seat pocket behind the front passenger seat containing a white, powdery substance.  Another baggie containing a white, powdery substance was found in Rodriguez's sock.

Rodriguez was charged in Santa Clara County with two felonies— possession for sale of a controlled substance (Health & Saf. Code, § 11351, count 1) and transportation, sale, or distribution of a controlled substance (*id.*, § 11352, subd. (a), count 2)—as well as two misdemeanors—using or being under the influence of a controlled substance (*id.*, § 11550, subd. (a), count 3) and driving on a suspended license (Veh. Code, § 14601.1, subd. (a), count 4).  In connection with count 4, the People alleged that Rodriguez was previously convicted in March 2011 for driving on a suspended license.

Rodriguez moved to suppress evidence from the vehicle search and Bachman's physical observations as fruits of an unlawful detention. Claiming Bachman detained Rodriguez and lobbed questions about where he lived on seeing nothing more than a man legally park his car, Rodriguez argued that the subsequent search and discovery of a substance that looked like cocaine were subject to the exclusionary rule.  In addition, Rodriguez invoked the *Harvey-Remers-Madden* rule, requiring the prosecution to establish the source or reliability of arrest warrant information that Bachman claimed to have received.  (See *People v. Harvey* (1958) 156

4

Cal.App.2d 516, 523–524; *Remers v. Superior Court* (1970) 2 Cal.3d 659, 666–667; *People v. Madden* (1970) 2 Cal.3d 1017, 1021.)[2]

The People opposed the motion, arguing the initial encounter was consensual and not a detention. It was only when Bachman asked Rodriguez for identification that the People believed a detention occurred, and this was supported by reasonable suspicion that Rodriguez was under the influence of a controlled substance. Once Rodriguez was detained, the People claimed Bachman was entitled to ascertain his identity, arrest him on an outstanding warrant, and search his vehicle and person incident to arrest. Alternatively, the People argued that even if Bachman's initial encounter with Rodriguez was unlawful, the exclusionary rule did not apply because discovery of the arrest warrant attenuated any taint under *Utah v. Strieff* (2016) 136 S.Ct 2056 (*Strieff*).[3]

At an August 2017 evidentiary hearing, the parties examined Bachman as the sole witness. The prosecution introduced into evidence a certified copy of the DMV printout, to show that Rodriguez's license was suspended at the time of the stop (Exhibit 1), and a copy of Rodriguez's criminal record, which

---

[2]     Although an officer may arrest or detain a suspect based on information received through official channels, once a defendant properly objects, the prosecution must establish that the source of the information received is something other than the imagination of a nontestifying officer or dispatcher. (*People v. Brown* (2015) 61 Cal.4th 968, 983 (*Shauntrel Brown*) [recording of 911 call demonstrated adequate indicia of caller's reliability to justify deputy's reliance].)

[3]     Other arguments made by the People (e.g., that Bachman had probable cause to search the vehicle upon determining that Rodriguez was high) are not relevant to this appeal.

included a "CLETS printout"[4] indicating an outstanding arrest warrant matching the docket number in Bachman's report (Exhibit 2). The court continued the hearing to permit Rodriguez to submit a supplemental brief. Arguing in his brief that *Strieff* was distinguishable because Bachman lacked any foundational basis to detain him, Rodriguez claimed Bachman's behavior was flagrant and weighed against attenuation.

The parties appeared before Judge Geffon for continued argument in September 2017. First, the court considered whether Bachman's initial encounter was a detention. On this, it deemed the record "clear that the officer's conduct crossed the line of a consensual encounter and became a detention." "The spotlight, in addition to the comments and the actions of the officer," the court believed, "made it so that a reasonable person would not have felt free to leave or break off that encounter." By the officer's own admission, the court found there was no reasonable suspicion to justify that detention.

Because it found the detention unlawful, it turned to whether the exclusionary rule applied, or whether discovery of the warrant was an intervening event that attenuated the taint under *Strieff, supra,* 136 S.Ct. 2056. Of the three attenuation factors in *Strieff*, the court focused mainly on the third factor—whether Bachman's conduct was purposeful or flagrant.[5]

---

[4]    CLETS is an acronym for the "California Law Enforcement Telecommunications System."

[5]    The court suggested that "the first two factors under *Strieff* are in favor of attenuation without really too much difficulty." Because these factors—temporal proximity and intervening circumstances—typically cut in opposite directions (*Strieff, supra,* 136 S.Ct. at p. 2062), we interpret the court's comments to reflect its conclusion that *on balance*, the first two factors favored a finding of attenuation.

6

Judge Geffon began this inquiry by noting that *Strieff* faulted the officer for not simply asking what was happening in the suspected drug house, citing *Florida v. Bostick* (1991) 501 U.S. 429 for the proposition that a seizure does not occur simply because an officer approaches and asks an individual a few questions. (See *Strieff, supra,* 136 S.Ct. at p. 2063.) But the officer's failure to inquire was deemed to be a "good-faith mistake[ ]" reflecting "at most" negligence. (*Ibid.*) Drawing a parallel to this case, Judge Geffon could not say that Bachman was purposeful or flagrant in detaining Rodriguez without reasonable suspicion. Rather, in the judge's view, Bachman "clearly" intended to engage in a consensual encounter but went too far in his attempt. As a result, this was a mere act of negligence and not the type of purposeful or flagrant misconduct the exclusionary rule served to deter.

Rodriguez filed a motion for reconsideration. In his supporting memorandum, Rodriguez claimed that Bachman detained him "solely on a hunch, without any articulable basis for suspecting illegality," rendering the official misconduct "critically different" than that considered in *Strieff*. As he does on appeal, Rodriguez relied on *People v. Bates* (2013) 222 Cal.App.4th 60 (*Bates*), an attenuation case involving the intervening discovery of a probation search condition, to argue that suppression was required to deter officers from engaging in such suspicionless fishing expeditions.

The People opposed the reconsideration motion, arguing Penal Code section 1538.5[6] did not permit it and, even otherwise, *Bates* was not "new" law. The People maintained that the court properly applied *Strieff, supra,* 136 S.Ct. 2056 to conclude that Bachman's discovery of the arrest warrant attenuated any taint from the initial stop. To the extent the court

---

[6]     Further undesignated statutory references are to the Penal Code.

7

reconsidered its ruling, the People urged it to find that the initial encounter between Bachman and Rodriguez was consensual rather than a detention.

The court denied the reconsideration motion in January 2018, leaving its previous ruling in place. Four days later, Rodriguez pleaded no contest to all counts and admitted his prior conviction for driving on a suspended license. At sentencing in March 2018, the court placed Rodriguez on formal probation for three years subject to various terms and conditions. It also imposed a four-month sentence in county jail, with a total of 20 days of credit for time served; the jail sentence was suspended pending resolution of Rodriguez's appeal.

## DISCUSSION

"In reviewing the trial court's suppression ruling, we defer to its factual findings if supported by substantial evidence. We independently assess the legal question of whether the challenged search or seizure satisfies the Fourth Amendment." (*Shauntrel Brown, supra,* 61 Cal.4th at p. 975.)

On appeal, Rodriguez focuses on the trial court's attenuation ruling, distinguishing Bachman's conduct from that of the officer in *Strieff*. He also raises a new argument, relying on a criminal history report contained in the clerk's transcript to argue the prosecutor failed to prove the warrant in question was effective on the date of his stop. The People rebut these claims and further urge us to conclude that the initial encounter was consensual.

The detention question may present a closer call than this court recently faced in *Kasrawi, supra,* 65 Cal.App.5th 751, review granted.[7]

---

[7] We found a detention in *Kasrawi* based on the "manner in which [the officer] confronted Kasrawi—including his use of the spotlight, the position of his car, how quickly he got out and walked to Kasrawi, and the immediate, direct question he posed," and that the seizure was unlawful because it was based on a "mere hunch" of criminal activity. (65 Cal.App.5th at

Because doing so does not change our analysis, we will assume without deciding that Bachman's initial encounter with Rodriguez indeed amounted to an unlawful detention—i.e., as the trial court found, Rodriguez was detained from the moment Bachman approached on foot from his patrol vehicle, and not from a later point when Bachman suspected that Rodriguez was under the influence of a controlled substance. In this scenario, an exception to the exclusionary rule nonetheless applies if Bachman's discovery of the arrest warrant attenuated the taint from the unlawful detention. For reasons we explain, sufficient evidence supports the court's factual finding that Officer Bachman intended to create a consensual encounter but took matters too far. As this is not the type of flagrant, purposeful behavior the exclusionary rule is designed to deter, we find no error in denying Rodriguez's motion to suppress.

A.    *The Attenuation Doctrine*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." (U.S. Const., 4th Amend.) Although this right was originally enforced through other means, in the 20th century courts increasingly applied the exclusionary rule "to exclude unlawfully seized evidence in a criminal trial." (*Strieff, supra,* 136 S.Ct at p. 2061.) The exclusionary rule applies to "both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called ' "fruit of the poisonous tree." ' " (*Ibid.*) Recognizing the significant costs of this rule, the United States

---

pp. 756−757, review granted.) Although the time of night and use of a spotlight are similar, other factors (such as Rodriguez stepping outside his vehicle as Bachman approached and Bachman's less pointed questioning) may suggest a less confrontational encounter.

9

Supreme Court has recognized several exceptions.  (*Ibid.*)  Attenuation, at issue here, applies "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' " (*Ibid.*)  An officer's discovery of a valid, preexisting arrest warrant may attenuate the taint from an unlawful stop.  (*Ibid.*)

In evaluating whether an intervening event breaks the causal chain between an unlawful stop and subsequent search, *Strieff* directs courts to consider three factors:  the time lapse between the unlawful stop and the search (with a short interval favoring suppression), the presence of intervening circumstances (with a valid warrant "strongly" disfavoring suppression), and the purposefulness or flagrancy of the police misconduct (with suppression warranted as to misconduct "most in need of deterrence"). (*Strieff, supra,* 136 S.Ct. at pp. 2061−2063.)  *Strieff* derived these attenuation factors from *Brown v. Illinois* (1975) 422 U.S. 590, 603–604 (*Brown*).  Eight years before *Strieff*, our Supreme Court referred to the same *Brown* factors in *People v. Brendlin* (2008) 45 Cal.4th 262, 270−272 (*Brendlin*) to decide whether the taint from an unlawful traffic stop was attenuated by the officer's discovery of an outstanding arrest warrant.  As *Brendlin* explained, the third factor, "the flagrancy and purposefulness of the police misconduct, is generally regarded as the most important because 'it is directly tied to the purpose of the exclusionary rule—deterring police misconduct.' " (*Id.* at p. 271.)

Applying these factors, the federal Supreme Court found attenuation in *Strieff* where a man leaving a suspected drug house was stopped by a police officer who had no reasonable suspicion the man was involved in illegal

10

activity. Discovering during the stop that Edward Strieff was the subject of an outstanding arrest warrant, the officer arrested and searched him. As the court reasoned, although the first attenuation factor (time elapsed) favored suppression, the second and third "strongly" favored attenuation. (*Strieff, supra,* 136 U.S. at pp. 2062–2063.) The discovery of a valid, preexisting, untainted arrest warrant was a "critical intervening circumstance." (*Id.* at p. 2063.) Once discovered, the officer had a ministerial obligation to arrest Strieff independent of any unlawful stop. (*Id.* at pp. 2062–2063.) Turning to the third factor, the majority found it "especially significant" that the illegal stop did not reflect "flagrantly unlawful police misconduct." (*Id.* at p. 2063.) In their view, officer's failure to investigate how long Strieff was in the drug house or ask Strieff a few simple questions as to what was going on inside the house were "good-faith mistakes," making the officer "at most negligent." (*Id.* at p. 2063.) There was "no indication that this unlawful stop was part of any systemic or recurrent police misconduct" nor part of a "suspicionless fishing expedition" requiring deterrence by exclusion. (*Id.* at pp. 2063–2064.)

Applying similar logic, the California Supreme Court found attenuation in *Brendlin* where a deputy made a traffic stop without reasonable suspicion. Questioning the vehicle's occupants, he recognized one of the passengers and ran a records check revealing that Bruce Brendlin had an outstanding arrest warrant. He arrested Brendlin and searched him, recovering drug-related evidence on his person and in the vehicle. (*Brendlin, supra,* 45 Cal.4th at p. 266.) Although the short time interval between the stop and the search favored suppression, the other two factors outweighed it. (*Id.* at pp. 270–272.) Discovery of the outstanding arrest warrant supplied authorization to arrest and search Brendlin "completely independent of the circumstances that led the officer to initiate the traffic stop," rendering the

11

recovered evidence "fruit of the outstanding *warrant*, [that] was not obtained through exploitation of the unlawful traffic stop." (*Id.* at p. 271, italics added.) Although the officer made a mistake in ordering a stop to investigate the vehicle's registration, the mistake "was not so obvious as to make one question [the deputy's] good faith in pursuing an investigation of what he believed to be a suspicious registration, nor [did] the record show that he had a design and purpose to effect the stop 'in the hope that something [else] might turn up.'" (*Ibid.*)

Finally, this court recently considered the attenuation doctrine in *Kasrawi, supra,* 65 Cal.App.5th 751, review granted on facts closely paralleling those here. There, Officer Pardue detained defendant Omar Kasrawi without reasonable suspicion, on a mere hunch that he was casing vehicles after watching him cross the street late at night to his legally parked car. (*Id.* at pp. 754–755; see fn. 5, *ante.*) But shortly after making the stop, Pardue learned that Kasrawi was subject to an outstanding arrest warrant and placed him under arrest. A subsequent search yielded stolen items in Kasrawi's pockets and in his car. (*Id.* at p. 755.) Applying *Brendlin* and *Strieff*, we concluded the officer's discovery of the outstanding warrant attenuated any taint from the illegal detention. (*Kasrawi,* at p. 763.) Although the search happened soon after the illegal detention, the other two attenuation factors weighed against suppression. "As in both *Strieff* and *Brendlin*, the officer's discovery of a warrant constituted an intervening circumstance that separated the evidence he collected from the illegal detention." (*Kasrawi,* at p. 763.) Moreover, we did not find any flagrant misconduct or abuse of police power that would justify exclusion. It appeared clear from the officer's body-worn camera footage and testimony that the officer "thought he detained Kasrawi only after gaining sufficient information

12

to justify an investigatory stop.  That his approach was assertive enough to make Kasrawi believe he was not free to leave does not transform this liminal illegal stop into a flagrant abuse of police power." (*Ibid.*)

B.    *Request for Judicial Notice*

To buttress his position that the taint from any unlawful detention was not attenuated, Rodriguez asks that we take judicial notice of a January 2017 city-commissioned study of the San Jose Police Department's traffic and pedestrian stops by race, indicating disproportionate stops of Hispanic motorists relative to the population benchmark.[8]  (See Evid. Code, §§ 452, subd. (h) and 459.)  Although the study was not presented to the trial court, Rodriguez believes it is "highly relevant" to his argument on appeal that Bachman's suspicionless stop is the type of police misconduct needing to be deterred.  In his view, it "supports the inference that Officer Bachman detained appellant because appellant was Hispanic."[9]

We decline Rodriguez's invitation for several reasons.  First and foremost, we do not generally take judicial notice of material for the first time

---

[8]    The introduction to the study indicates that the City of San Jose contracted with a research center at University of Texas at El Paso to conduct a statistical analysis of the San Jose Police Department's stop data collected from September 1, 2013 to March 31, 2016.

[9]    Despite disagreement as to what *evidence* would suffice, the *Strieff* majority and dissenting justices broadly agreed that a sufficient showing of systemic problems within a police department weighs against attenuation. (Compare *Strieff, supra,* 136 S.Ct at p. 2064 ["Were evidence of a dragnet search presented here, the application of the [*Brown, supra,* 422 U.S. 590] factors could be different."] with *Strieff,* at pp. 2068–2069 (dis. opn. Sotomayor, J.) & p. 2073 (dis. opn. of Kagan, J.); see also *Herring v. United States* (2009) 555 U.S. 135, 144 ["the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, *or in some circumstances recurring or systemic negligence,*" italics added].)

on appeal (*People v. Guarneros* (2016) 5 Cal.App.5th 42, 51, fn. 4), and Rodriguez does not suggest there is any reason why this material could not have been presented to the trial court in the first instance. Moreover, there are good reasons why "an appellate court generally is not the forum in which to develop an additional factual record." (*People v. Peevy* (1998) 17 Cal.4th 1184, 1207.) Here, for instance, the parties dispute the relevance of the information in the San Jose study and, if relevant, disagree whether we should focus on its findings regarding traffic stops or pedestrian stops. Had the study been offered into evidence before the trial court, the parties could have called expert witnesses to explain or contest the relevance.[10] There are no unusual or compelling reasons in this case to depart from the general rule that evidence must first be presented to the trial court.

C. *Application of the Relevant Factors Compels a Finding of Attenuation*

Rodriguez attempts to distinguish *Strieff*, arguing that unlike the officer there, Bachman was not conducting any bona fide investigation, rendering his suspicionless stop a purposeful and flagrant fishing expedition. He relies on *Bates, supra,* 222 Cal.App.4th 60, 71, which rejected the People's claim that discovery of the defendant's probation search condition attenuated the taint associated with an illegal investigatory stop.

---

[10] For instance, the People contend the study's findings do "not support an inference of racial bias on the part of any individual officer in the San Jose Police Department," and point to language in the study to buttress that point. This seems particularly true given the court's findings that it was "pretty clear" Bachman never intended to detain Rodriguez and rather "clearly attempt[ed] . . . a consensual encounter." Even if credited, a study showing disproportionate stops of Hispanic motorists by the San Jose Police Department would not suggest that *Bachman*, by unintentionally taking a consensual encounter too far, was furthering a department-wide practice of discriminatory stops.

14

The first *Brown* factor is not in dispute. The entire encounter between Bachman and Rodriguez, from initial conversation to search, happened "fairly quickly." The short time lapse between a suspicionless stop and search incident to arrest favors suppression. (*Strieff, supra,* 136 S.Ct. at p. 2062.) However, this factor may be outweighed by the others. (*Id.* at pp. 2062–2063; *Brendlin, supra,* 45 Cal.4th at p. 271.)

Turning to the second factor, *Strieff* describes the discovery of a valid, preexisting arrest warrant as a factor that "strongly favors" attenuation. (*Strieff, supra,* 136 S.Ct. at p. 2062.) Once an officer discovers an outstanding warrant, he has an obligation to arrest the defendant; the arrest becomes "a ministerial act that was independently compelled by the pre-existing warrant." (*Id.* at pp. 2062–2063; see *Brendlin, supra,* 45 Cal.4th at p. 271 [same].) This critical difference between a probation search condition and an arrest warrant defeats Rodriguez's reliance on *Bates*. As *Bates* itself explained, a probation search condition "is a discretionary enforcement tool and therefore a less compelling intervening circumstance than an arrest warrant." (*Bates, supra,* 222 Cal.App.4th at p. 70.) *Bates* distinguished *Brendlin* on this very basis. (*Bates,* at p. 70.) In short, federal and state precedent compel a finding that the second factor—the intervening discovery of a valid, preexisting, untainted arrest warrant—strongly favors attenuation.

Rodriguez next argues as a factual matter that insufficient evidence supports the trial court's finding that Rodriguez was subject to a *preexisting* arrest warrant. At the suppression hearing, Bachman testified that he was informed by dispatch of an active arrest warrant and later determined that docket number to be NM424694A. The People offered as Exhibit 2 a CLETS printout apparently listing at the bottom of page four *of seven* an outstanding

15

warrant from Redwood City matching that same docket number. Rodriguez did not contest the existence of an outstanding warrant before the trial court but suggests on appeal that the prosecutor erroneously directed the court's attention to an event that occurred seven months *after* the stop. He points to page four of an *eight-page* CLETS printout appended to a criminal history report included in the clerk's transcript, which lists docket number NM424694A next to a November 2016 event.[11] But as the People note, Exhibit 2 is not part of our record and could not be found in the case file by the deputy clerk. There is no indication the criminal history report in the clerk's transcript is identical to what the People offered at the suppression hearing as Exhibit 2. Because we indulge every presumption in favor of the court's ruling, we cannot evaluate Rodriguez's claim on an incomplete record. (See *People v. Chubbuck* (2019) 43 Cal.App.5th 1, 12–13; *People v. Whalen* (2013) 56 Cal.4th 1, 84–85; see also *People v. Coley* (1997) 52 Cal.App.4th 964, 970–972 [where trial exhibits cannot be located on appeal, defendant claiming insufficient evidence "bears the burden to show the deficiencies in the record are prejudicial," e.g., by moving for reconstruction of lost exhibits].)

Turning to the third attenuation factor, the trial court made a factual finding that Bachman "clearly" intended to create a consensual encounter with Rodriguez and through mere negligence took matters too far and detained him. This finding is amply supported. Bachman testified that he approached a recently parked vehicle to speak to the person sitting in the driver's seat. As he walked over, Rodriguez stepped out. The two had a conversation, with Bachman asking "what's up" and Rodriguez explaining that he had just gotten off of work and lived around the corner, but had to

---

11      Elsewhere, that same report lists two arrests in 2015 under that same docket number.

park on Pedro Street. Bachman did not believe he stopped Rodriguez until asking him for identification, and by this point he believed he had reasonable suspicion Rodriguez was under the influence of a controlled substance.

Although Bachman was simply on patrol rather than engaging in an investigation like the officer in *Strieff*, nothing in their initial exchange after the stop suggests a "suspicionless fishing investigation" that courts must deter. (See *Strieff, supra,* 136 S.Ct. at p. 2064.) Assuming Bachman lacked reasonable suspicion to detain Rodriguez, that fact alone does not make his conduct flagrant: "For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause." (*Ibid.*; see also *Brendlin, supra,* 45 Cal.4th at p. 271 ["a mere 'mistake' with respect to the enforcement of our traffic laws does not establish the traffic stop was pretextual or in bad faith"].) Looking to the suggestion in *Strieff, supra,* at page 2063 that the officer *should have* attempted a consensual encounter, the trial court concluded that a mistake in taking a consensual encounter *too far* was not the type of flagrant or purposeful conduct that defeats attenuation. We agree.

*Kasrawi* is on point. There, an officer watched the defendant cross the street to his legally parked vehicle and detained him on nothing more than a hunch that he was casing cars in the area. Like Bachman, Officer Pardue thought he was engaging in a consensual encounter and believed he detained the defendant only after gaining sufficient information to make a stop. (See *Kasrawi, supra,* 65 Cal.App.5th at p. 763, review granted.) That his approach was enough to make Rodriguez believe he was not free to leave did not transform an illegal stop into a flagrant abuse of police power. (*Ibid.*) The same reasoning compels the conclusion that Bachman's conduct in taking

17

a consensual encounter a step too far is not the type of purposeful or flagrant conduct that the exclusionary rule was meant to deter.

In urging a different result, Rodriguez relies on *State v. Cohagan* (Idaho 2017) 404 P.3d 661 (*Cohagan*), which rejected as flagrant a detention made for the sole purpose of running a warrant check. *Cohagan* involved two police officers on patrol who believed a man entering a grocery store had an outstanding arrest warrant. One officer went inside, checked for identification, and discovered that Matthew Cohagan was not the intended suspect. The officers left the store but circled back, and the other officer again asked Cohagan for identification, even though he realized as he approached that Cohagan was not the suspect. The officer then made Cohagan wait as he ran a records check, which revealed an outstanding arrest warrant. A search incident to the subsequent arrest revealed drug contraband. (*Id.* at pp. 661–662.) Distinguishing *Strieff*, the Idaho Supreme Court determined that the officers' conduct was flagrant and purposeful. Unlike the officer in *Strieff*, who was negligent during a good faith investigation, the court believed the officers in *Cohagan* were engaged in a suspicionless fishing expedition in hopes a warrant would exist, precisely what the exclusionary rule was designed to deter. (*Cohagan,* at pp. 665–666.)

It is true that Bachman, like the officers in *Cohagan*, was not engaged in any bona fide investigation when the stop occurred. But that is where the similarities end. The officers in *Cohagan* plainly intended to detain the individual, whereas the trial court reasonably determined that Bachman only intended a consensual encounter. The court believed the officer's actions had the effect of making a reasonable person in Rodriguez's shoes believe he was not free to leave, but that is not the freewheeling abuse of power confronted

18

in *Cohagan* or similar out-of-state authorities.[12]  Rather, this case is far closer to *Kasrawi*, and we follow its approach in finding no flagrant or purposeful conduct to overcome attenuation here.  (*Kasrawi, supra,* 65 Cal.App.5th at p. 763, review granted.)

DISPOSITION

The order denying Rodriguez's motion to suppress is affirmed.

DATO, J.

WE CONCUR:

AARON, Acting P. J.

IRION, J.

---

[12]  In addition to *Cohagan*, Rodriguez cites pre-*Strieff* authority from Kansas and Illinois rejecting attenuation where officers stopped pedestrians for no apparent reason except to fish for outstanding arrest warrants.  (*State v. Williams* (Kan.Ct.App. 2013) 300 P.3d 1072, 1082; *People v. Mitchell* (Ill.Ct.App. 2005) 824 N.E.2d 642, 649−650.)  *Strieff* likewise suggested attenuation would not be found where an officer stops an individual solely to fish for evidence.  (*Strieff, supra,* 136 S.Ct. at p. 2064; see also *State v. Ramey* (N.M.Ct.App. 2020) 473 P.3d 13, 21 [finding flagrancy where evidence revealed officer's true purpose in gathering pedestrian's information was to run a warrant check].)  But as the People suggest, none of Rodriguez's out-of-state cases "concerned the situation here, where the superior court concluded that an officer's negligence transformed a consensual encounter into a stop."

19